Madden, Judge,
delivered the opinion of the court:
This is a suit against the United States by the Uintah and White River Bands of Ute Indians. They assert, and the Government denies, that this court has jurisdiction of the case under the special Ute Jurisdictional Act of June 28, 1938, as amended.[1] By section 1 of that Act this court is authorized to “hear, determine, and render final judgment on all legal and equitable claims of whatsoever nature which the Ute Indians or any tribe or band or any constituent band thereof, may have against the United States, including, * * * claims arising under or growing out of any treaty or agreement of the United States, law of Congress, executive order, or by reason of any land taken from them, without compensation.”
The plaintiffs claim just compensation for 973,777 acres of the former Uintah Indian Reservation in Utah, taken by *3 the United States on July 14, 1905, by incorporation into the Uintah National Forest. The questions now ready for decision are whether the plaintiffs were the owners of the land at the time in question; if they were, what was the value of the land at the time it was taken; and are they entitled to interest on that value.
THE PLAINTTFP’S TITLE
By an Executive Order of October 3, 1861, 1 Kappler 900, President Lincoln approved a recommendation of the Secretary of the Interior that “the Uintah Valley, in the Territory of Utah, be set apart and reserved for the use and occupancy of Indian Tribes”. The lands involved in this, case lie within the area described in the Executive Order.
The Act of May 5, 1864, 13 Stat. 63, authorized and required the Superintendent of Indian Affairs to bring together and settle in the Uintah Valley as many of the Indians of Utah Territory as might be found practicable. It said that the Uintah Valley
is hereby set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit. the same.
Pursuant to an Act of February 23, 1865, 13 Stat. 432, a treaty was negotiated with numerous Indian tribes in Utah providing for their surrender of all their rights in land in that territory which was suitable for agricultural and mineral purposes, but reserving to the Indians for their exclusive use and occupation “the entire valley of the Uintah River within Utah Territory”.
Although the treaty just described was never ratified* various individual Indians and groups of Utah Indians, from time to time after 1865, moved into the Uintah Valley. An Indian Agency was established there, the area became known as the Uintah Indian Reservation, and the Indians so migrating into the reservation, as well as those already there before the reservation was established, and their descendants, became and have since been known as the Uintah Indians or Uintah Ute Indians, one of the plaintiffs herein.
In 1868 a treaty was made with seven bands of Ute In *4 dians, sometimes thereafter known as “The Confederated Bands of Ute Indians”. This treaty was later duly ratified. It set apart a large reservation, wholly within the Territory of Colorado, for the Indians named in the treaty and for such other friendly Indians as they might be willing to admit among them. The Indians relinquished all claims and rights to land not included within the reservation.
In an agreement embodied in the Act of June 15, 1880, 21 Stat. 199, with the Confederated Bands of Ute Indians in Colorado, the Indians ceded the then remaining portions of their Colorado reservation and the various bands agreed to settle in other places designated in the agreement. Of interest in this case were the provisions that the White River Utes agreed to remove to the Uintah Reservation in Utah and the Uncompahgre Utes agreed to remove to an area on the Grand River, in Colorado, or to other lands in that vicinity and in Utah. The White River Utes then moved to the Uintah Reservation in Utah, and their descendants have continued to live on that reservation. This band and the Uintah band are the plaintiffs in this case. The Uncom-pahgre Utes were settled upon a reservation in Utah which was not within the area of the Uintah Reservation.
Thus far, on the question of title, we have the 1864 Act setting apart the Uintah Reservation
for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory (Utah) as may be induced to inhabit the same.
We have Indians who were already in the area and others of different Utah bands moving into the area and settling there, apparently losing their identity and becoming known as “Uintah Ute” Indians. It could well be urged that these Indians, having fulfilled the conditions of the statute, became the grantees, or at least “recognizees” under the statute. It is as if one made a deed “to the first of my grandsons who shall reach the age of 25”.
The Indian Claims Commission, on February 21, 1951, in the case of The Uintah Ute Indians of Utah v. United States, Docket No. 45, held that the United States is liable to the Uintah Ute Indians for the undivided share of the *5 reservation which the United States turned over to the White River Utes pursuant to the 1880 statute.
The Act of May 24, 1888, 25 Stat. 157, provided that a designated portion of the Uintah Yalley Reservation should be restored to the public domain and sold if three-fourths of the adult male Indians residing on the reservation consented. The statute provided:
That all moneys arising from the sales of this land shall belong to said Indians and be paid into the Treasury of the United States and held or added to any trust funds of said tribes now there.
In the administration of this Act, the consent of the Uintah and the White River Indians was obtained, the lands were sold, and the receipts were credited to these two bands of Indians. In 1902, Congress appropriated $10,000 more to these Indians for other lands detached from the reservation pursuant to the 1888 statute.
Bills were introduced in Congress in 1898 proposing that the Uncompahgre Indians be allotted lands in the Uintah Reservation. The Secretary of the Interior and the Commissioner of Indians Affairs, being asked to comment on the bills, opposed the bills on the ground that the Indians residing on the Uintah Reservation owned the land, and that it should not be taken from them except by negotiation and purchase. The bills were not passed.
In finding 14 we recite administrative actions taken in 1892, 1897, and 1898 on the express assumption that the Uintah and White River Utes owned the land in the Uintah Reservation. Pursuant to statutes cited in our findings 15, 16, and 17, some Uncompahgre Indians were given allotments in severalty in the Uintah Reservation, and the Uintah and White River Utes were paid $60,064.48 for the lands so allotted.
By the Act of May 27,1902,32 Stat. 245,268, the Secretary of the Interior was directed, if a majority of the adult male Indians of the Uintah and White River bands consented, to make individual allotments to the Indians and then restore all of the unallotted lands of the Uintah Reservation to the public domain, to be sold under the homestead law for $1.25 an acre, the proceeds to be used for the benefit of said *6 Indians. The allotments were made, and sales of the lands restored to the public domain ultimately produced proceeds of $1,184,996.33 which were placed in an account headed “Proceeds of Unitah and White River Ute Lands”.
Our finding 19 shows that later in 1902, and before the allotments had been made and the unallotted lands restored to the public domain, Congress directed the Secretary of the Interior to set apart for the Indians a common grazing area in the reservation. The statute seems to have reduced the allotments of the Uncompahgre Indians, but gave them rights in the common grazing area.
By the Act of March 3,1905, 33 Stat. 1048,1069-70, Congress, among other things, authorized the President to set apart and reserve, as an addition to the Uintah Forest Reserve, such portions of the lands within the Uintah Indian Reservation as he considered necessary. The President, on July 14,1905, 34 Stat. (Part 3) 3116, set aside 1,010,000 acres of land under this authority. This land was, of course, a part of the land which, under the Act of May 27, 1902, was to have been restored to the public domain, sold, and the proceeds used for the benefit of the Uintah and White River Indians. No provision was made for paying the Indians for the 1,010,000 acres of land, and they are now suing for its value.
In this opinion we have abbreviated the history of the dealings of Congress and the Executive with these Indians in relation to this land. A much fuller history appears in our findings. It plainly appears from it, we think, that Congress in its statutes, and the Executive in interpreting those statutes, repeatedly recognized the plaintiff bands as the owners of the Uintah Reservation. They were the ones whose consent had to be obtained, when transactions relating to the land were contemplated. They were the ones to whom the money was to be paid and was paid, when reservation land was disposed of to third persons.
Between 1924 and 1929 several unsuccessful attempts were made to obtain passage of special jurisdictional acts to permit the plaintiff bands to sue in this court for the taking of the 1,010,000 acres of land. In 1930 a bill was introduced providing for a direct payment for the lands, at the rate of *7 $1.25 per acre. In this bill, for' the first time, the Uncom-pahgre Band of Utes was included with the Uintah and White Biver Bands. The committee report and material inserted in the Congressional Record discussed only the title of the Uintah and White River Bands. There is no explanation or mention of a reason for including the Uncompahgre in the bill.
The bill was enacted on February 13, 1931, 46 Stat. 1092, and provided for the direct payment of $1,217,221.25 for 973,777 acres of land, which was at the rate of $1.25 per acre. The bill said that the payment was to be in full satisfaction of all claims of the Indians in relation to the 973,777 acres of land. The remainder of the land, 36,223 acres, was said to be coal land, and action on it was reserved. The appropriated money was distributed per capita to the three bands of Indians, the Uncompahgre receiving $439,466.88 of it. The coal lands are the subject of another suit now pending in this court.
THE JURISDICTIONAL ACT
The jurisdictional act, cited supra, gives the court jurisdiction to decide the plaintiffs’ claims arising “by reason of any lands taken from them without compensation.” The Government points to the payment made under the 1931 Act and says that these lands were not taken without compensation. We have no doubt that the Jurisdictional Act was intended to include these claims. The pertinent committee reports say so in express words. House Rept. No. 1028, 75th Cong., 1st sess., on HR 3162, pp. 2-3; Senate Rept. No. 1219, 75th Cong., 1st sess., pp. 2-3. And section 5 of the Jurisdictional Act itself provides that payments made by the United States upon or in satisfaction of any claim sued on under the Act should not operate as an estoppel, but only as a setoff against the claim. Our conclusion is that the court has jurisdiction of the claim.
THE VALUE OF THE LAND
The land was taken in 1905, and must be valued as of that date. The valuation of an area of land such as the one here involved, as of today, would be a task of great difficulty, *8 and the figure arrived at would be, at best, an approximation, reached by weighing a large number of elements of greater or lesser significance, and giving each the weight which it was thought to merit. In the instant case, the relevant events and elements are those of fifty years ago. Highly competent experts were presented by the parties. But they disagreed as to whether 1905 was an unusually dry season, or on the other extreme, was a year of record-breaking rainfall; whether the edible plant growth was more abundant in 1905 than now, because it had been overgrazed during World War I, or the management of the Forest Service had so improved it that it is better now than it ever was; whether in 1905, small tracts of this kind of land brought higher prices per acre than large ones, or vice versa. Thus there was disagreement, even as to relevant historical facts. There was disagreement as to conclusions to be drawn even from undisputed historical facts, such as the prices at which the railroads in the area sold their alternate sections of land. Did they sell them cheap in order to settle the country and get in cash to retire their bonds, or did they hold out for about the market price ? There was disagreement as to how far from the area in question land transactions might take place, and still be helpful in arriving at the market value of these lands. Many lay witnesses were presented by the plaintiffs, old residents who recollected, more or less accurately, events and transactions of the time in question.
Commissioner Hogenson of this court presided over the lengthy trial and has made an able and obviously careful report. He had a better opportunity than we have to acquire a realistic understanding of the problem of the value of these lands as of 1905, and we think his conclusion is substantially right. We therefore find, as he did, that the value was $1.25 per acre.
THE PAYMENT TO THE TJNCOMPAHGKES
As we have seen, the 1981 Act required the payment of a share of the money granted by that act to the Uncompahgre Indians, and $439,466.88 of the money was paid to them. They had no title or interest in the Uintah Reservation except in the allotments which were bought for them from the plaintiffs, and in the common grazing area. They had, *9 therefore, no interest in the 973,777 acres of the land placed in the Forest Reserve, for which the 1981 payment was made. The United States is entitled to no credit for the $439,466.88 which was paid to the Uncompahgre Indians. It is entitled to credit for the $777,754.37 which was paid to the plaintiffs.
INTEREST
The parties disagree as to whether our judgment should include interest upon the sum which we find to be the 1905 value of the land in question. As we have said, the plaintiffs were the owners of the land in question, with a title repeatedly recognized by Acts of Congress, and by Executive actions taken pursuant to statutes. The United States, pursuant to an Act of Congress, took possession and ownership of the land for itself, for its Forest Reserve. No plainer case of an expropriation could be stated. In that respect the case is like United States v. Creek Nation, 295 U. S. 103, and Shoshone Tribe of Indians v. United States, 299 U. S. 476. It was held in those cases that in the case of an expropriation of lands owned by Indian Tribes, interest from the time of the taking must be included as a part of just compensation, in order to satisfy the Fifth Amendment. The decision in United States v. Alcea Band of Tillamooks, 341 U. S. 48, was based on the Court’s conclusion that no taking such as is contemplated by the Fifth Amendment occurred in that case.
If the plaintiffs were not, as we think they are, entitled to interest as a constitutional right, we think they would be entitled to interest under the provisions of the Jurisdictional Act. If Congress did not intend that the measure of recovery constitutionally required in expropriation cases should be applied, there was no reason for its express statement in section 6 that, if it found that the plaintiffs’ lands had been taken without compensation,
the court shall render judgment in favor of said Indians, and shall award to them, as for a taking under the power of eminent domain, compensation for all such lands * * *.
An interesting question arises as to the effect of the payment of the $777,754.37 by the United States to the plaintiffs in 1931 on the computation of interest. If it is applied to *10 reduce the principal, it would follow that no interest on that part of the principal would accrue after 1931. If it is applied on the interest accrued up to 1931, it is not enough to pay that interest, and would leave all of the principal continuing to draw interest since 1931.
The plaintiffs say that a payment not large enough to pay both interest and principal is to be applied first to interest, citing Story v. Livingston, 13 Pet. (38 U. S.) 359, 371. The Government says that this is the rule unless the debtor, when he makes his payment, stipulates that it is to be applied to principal. The authorities cited by the Government seem to relate not to the question of principal and interest, but to situations where the debtor owes the creditor more than one debt, and stipulates that his payment should, for example, be applied to a secured debt, when the creditor would prefer to apply it to an unsecured debt.
However, although there seems to be no precedent, we think that the general rule should be that the debtor may effectively direct the application of his payment. If he makes a payment stipulating that it shall be applied to principal, it would seem that the creditor would have no right to retain the payment and apply it to interest. If the interest is overdue, he may collect it by suit, but he can’t do it by self-help, by using for a purpose which he prefers, money which is put into his hands for another purpose.
If the intention of the debtor were controlling in the instant case, we have no doubt about the intention of Congress in 1931. It said that its payment was to be in full satisfaction of all claims relating to the land, and it fixed a price of $1.25 per acre for the land. It was thinking of principal, not interest.
The plaintiffs urge that the Jurisdictional Act has directed us how to apply the 1931 payment by saying, in section 5
No payment or payments which have been made by the United States upon or in satisfaction of any claim or claims in any suit brought hereunder * * * shall apply as an estoppel against any suit brought hereunder, but there shall be set off against any recovery * * * any payment made * * *.
*11 The plaintiffs say that this language directs us to compute their recovery as if no payment had been made in 1931, and then set off the 1931 payment against the result of that computation. This is a fair argument, and we are by no means certain that it is not correct. We conclude, however, that it was not meant by Congress as a specific direction as to how the computation should be made, but only as an assurance that the claims were not to be barred completely by a prior payment purportedly made in full satisfaction. We think Congress left to the Court the details of the computation, and expected us to make it in the same way that such a computation would be made in private litigation.
We do not adopt the proposal of either litigant. As to the Government’s contention as to the application of the 1931 payment, we think that in the instant situation the intention of the debtor is not controlling. The “debt” is not an obligation incurred by agreement, but one imposed by the law of the Constitution. Our duty, we think, is to apply the 1931 payment in such a way as to most nearly approach the Constitutional objective of compensation for the value at the time of taking, plus compensation, in the form of interest, for delay in paying for the value at the time of taking.
When the $777,754.37 was paid to the plaintiffs in 1931, 26 years of interest at 5% had accrued upon the 1905 value of the land. The $777,754.37 was, therefore, sufficient to pay principal (100%) plus accrued interest (130%) upon only $338,154.08 of the principal ($777,754.37-f-2.30=$338,154.08). We think it should be so applied. That means that as to that much of the principal, the payment was in full, and no further interest accrued. As to the balance of the principal, $879,067.17, no payment has ever been made, and that sum draws interest from 1905 to the date of payment.
We realize, of course, that such a formula, attempted to be patterned to fit a situation as unusual as the instant one where the Constitutional obligation has remained unfulfilled for more than fifty years, has rather rough edges. But it seems fairer to us than those proposed by the parties.
The plaintiffs are entitled to recover $879,067.17, with interest thereon, as a part of just compensation at 5% from *12 July 14, 1905 to July 14,1934, and at 4% from the latter date to the date of payment.[2] The question of the remaining offsets, if any, has not been determined, and the case will be remanded to the commissioner for further proceedings on that matter under Rule 38 (c).
It is so ordered.
LaRAmoRe, Judge; Whitaker, Judge; Litteeton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the briefs and argument of counsel, and the report of Commissioner Roald A. Hogenson, makes the following findings of fact:
1. Plaintiffs, the Uintah and White Eiver Bands of Ute Indians, who timely filed this suit pursuant to a statute conferring special jurisdiction upon this court (Act of June 28, 1938, 52 Stat. 1209, as amended), are two bands of Ute Indians, which, together with the Uncompaghre Band of Ute Indians, constitute the Ute Indian Tribe of the Uintah and Ouray Eeservation, a corporation formed under the Indian Reorganization Act of June 18, 1934, 48 Stat. 984. The members of plaintiff bands in general reside on the Uintah and Ouray Reservation, State of Utah, as do some of the Uncompaghre Band.
In pre-white times, Indians who have since come to be known as Utes, Southern Paiutes, and Shoshones lived within the territory now included in the State of Utah.
2. By Executive Order of October 3,1861, 1 Kappler 900, the President approved a recommendation of the Secretary of the Interior that “the Uintah Valley, in the Territory of Utah, be set apart and reserved for the use and occupancy of Indian tribes.” In the absence of an authorized survey, the area “reserved to the United States and set apart as an Indian reservation” was described as “the entire valley of the Uintah River within Utah Territory, extending on both sides of said river to the crest of the first range of contiguous mountains on each side.”
*13 The lands involved in this case are within the area so described.
3. By act oí May 5,1864,13 Stat. 63, it was provided:
* * * That the superintendent of Indian affairs for the territory of Utah be, and he is hereby, authorized and required to collect and settle all or so many of the Indians of said territory as may be found practicable in the Uintah valley, in said territory, which is hereby set apart for the permanent settlement and exclusive occupation of such of the different tribes of Indians of said territory as may be induced to inhabit the same.
4. By an act of February 23,1865,13 Stat. 432, “ * * * to extinguish the Indian Title to Lands in the Territory of Utah suitable for agricultural and mineral Purposes.”, the President was authorized and directed to enter into treaties with the various tribes of Indians of Utah Territory, providing for the surrender of their possessory right to all such lands, except such part as might be set apart for reservations. Pursuant to this act, treaties were negotiated with the “Pie-ede or Pah-Ute” Indians on September 18,1865, the “Weber Ute” on October 30,1865, 5 Kappler 698, and various groups of “Utah” Indians on June 8, 9, and 10,1865, 5 Kappler 695. None of the said treaties was ever ratified.
5. The Indian parties to the treaty negotiated on June 8, 9, and 10, 1865, commonly referred to as the Spanish Fork Treaty, were designated therein as the “* * * Utah, Yam-pah Ute, Pah-Vant, Sanpete Ute, Tim-p-nogs and Cum-nm-bah Bands of the Utah Indians occupying the lands within Utah Territory, * * The said treaty provided for the cession by said Indians of “all their possessory right of occupancy” to an area described therein, reserving a designated part thereof for their exclusive use and occupation as follows:
Art. II. There is however reserved for the exclusive use and occupation of the said tribes the following tract of lands; viz “the entire valley of the Uintah Eiver within Utah Territory extending on both sides of said river to the crest of the first range of contiguous mountains on each side” which said tract shall be, so far as is necessary, surveyed and marked out, set aside and reserved for their exclusive use and occupation nor shall any white person, unless he be in the employ of the *14 Indian authorities, be permitted to reside upon the same, without permission of the said tribe, ana of the Superintendent of Indian Affairs or United States Indian Agent. It is however understood that should the President of the United States hereafter see fit to place upon the reservation, any other friendly tribe or bands of Indians of Utah Territory, to occupy the same in common with those above mentioned, he shall be at liberty to do so.
Art. III. The said tribes and bands agree to remove to and settle upon the said reservation within one year after the ratification of this treaty, provided the means are furnished them by the United States to enable them to do so — In the meantime it shall be lawful for them to reside upon any land not in the actual claim and occupation of citizens of the United States, and upon any land claimed or occupied if with the permission of the owner.
6. From time to time after 1865, various individuals and groups of Indians residing in Utah Territory, other than those who were in Uintah Yalley at the time, moved into the area described in the Executive Order of October 8, 1861, and the unratified Spanish Fork Treaty of 1865, and set apart by the act of May 5, 1864, supra. An Indian agency was established known as the Uintah Yalley Agency, and the •area became known as the Uintah Indian Reservation or the Uintah Yalley Reservation. A substantial number of the said Indians, so located on the reservation, and their descendants have continued to live upon the reservation, have received individual allotments thereon pursuant to the act of May 27, 1902, as amended, and are now all known as Uintah or Uintah Ute Indians.
7. On March 2, 1868, a treaty was concluded (and subsequently ratified and proclaimed, 15 Stat. 619) between the United States and Indian parties designated therein as “the Tabequache, Muache, Capote, Weeminuche, Yampa, Grand River, and Uintah Bands of Utes,” sometimes referred to thereafter as the “Confederated Bands of Ute Indians.” Article II of the said treaty set apart a large reservation, wholly within the Territory of Colorado, for the use and occupation of the Indians therein named, and for such other friendly Indians as they might be willing to admit among *15 them. By Article III the Indians, parties thereto, relinquished all claims and rights in and to any other territory not included within the reservation. Article IV provided for the establishment of two agencies upon the reservation, “one for the Grand Biver, Yampa, and Uintah bands, on White Biver, and the other for the Tabequache, Muache, Weeminuche, and Capote Bands on the Bio de los Pinos * * The said agencies were established and Indians associated with the White Biver Agency in northwest Colorado came in time to be known as White Biver Utes or the White Biver Band of Ute Indians.
8. By an agreement approved by the act of June 15,1880, 21 Stat. 199, with the “Confederated Bands of Ute Indians in Colorado,” it was provided that the Indians would cede the then remaining portions of the Ute reservation in Colorado. The agreement provided for stated considerations to the Indians and that reservations be established for them as follows:
The Southern Utes agree to remove to and settle upon the unoccupied agricultural lands on the La Plata Biver, in Colorado; and if there should not be a sufficiency of such lands on the La Plata Biver and in its vicinity in Colorado, then upon such other unoccupied agricultural lands as may be found on the La Plata Biver or in its vicinity in New Mexico.
The Uncompahgre Utes agree to remove to and settle upon agricultural lands on Grand Biver, near the mouth of the Gunnison Biver, in Colorado, if a sufficient quantity of agricultural land shall be found there, if not then upon such other unoccupied agricultural lands as may be found in that vicinity and in the Territory of Utah.
The White Biver Utes agree to remove to and settle upon agricultural lands on the Uintah Beservation in Utah.
9. Pursuant to the Agreement and Act of June 15, 1880, supra, the White Biver Utes were removed to the Uintah Beservation beginning about November 1881. Pursuant to the same act and subsequent legislation they were given individual allotments on the Uintah Beservation. In general, the White Biver Ute Indians so removed to the reservation, and their descendents have continued to live upon the reservation.
*16 10. Pursuant to section 2 of the act of June 15, 1880, supra, a commission reported that it had examined the land on the Grand River near the mouth of the Gunnison, and had found insufficient suitable land for the Uncom-pahgre Utes. A tract of land in the valleys of the White and Green Rivers in Utah (south and east of the Uintah Reservation) was selected by the commission and approved by the Secretary of the Interior for the settlement of the Üncompahgre Utes, who removed thereto by October 1881. The Üncompahgre Reservation in Utah was established by Executive Order of January 5, 1882, 1 Kappler 901.
11. The act of May 24, 1888, 25 Stat. 157, provided that a designated portion of the Uintah Valley Indian Reservation should be restored to the public domain and sold upon ratification by three-fourths of the adult-male Indians residing on the reservation. The act provided further:
* * * That all moneys arising from the sales of this land shall belong to said Indians and be paid into the Treasury of the United States and held or added to any trust funds of said tribes now there.
Pursuant to this act, the required consent of the Uintah and White River Bands of Ute Indians was obtained, and the lands were sold by the United States and receipts therefrom in the amount of $22,417.93 were credited to the benefit of the Uintah and White River Bands of Ute Indians. Pursuant to the act of May 27, 1902, 32 Stat. 245, 263, as amended by the Joint Resolution of June 19, 1902, 32 Stat. 744, an additional $10,000 was appropriated and paid to the Uintah and White River Utes to cover claims for lands detached from the reservation pursuant to the act of May 24, 1888, supra.
12. On September 12, 1893, Mr. Rawlins of Utah introduced and-there was referred to the House Committee on Indian Affairs, H. Res. 45, 53d Congress, 1st session. This proposed joint resolution would have authorized and directed the Secretary of the Interior to release from the Uin-tah and Üncompahgre Indian Reservations in Utah and to restore to the public domain such portion or portions of either or both reservations “as are in his judgment desirable to be so released, having due regard to the interests of the *17 several Indian tribes hitherto occupying the same and to all rights secured to such Indians by any treaties or statutes.” By section 2 of the resolution it was provided:
That in case it shall appear to the Secretary of the Interior that any tribe or band of Indians have any title or proprietary interest in any body of land in their said reservations which should, in the judgment of the said Secretary, be restored to the public domain, it shall be lawful for the Secretary to appoint and send out a commission for the purpose of treating with such Indians for the purchase of such title or interest; and the result of such negotiations shall be communicated to Congress.
On December 7,1893, Mr. Rawlins introduced IT. R. 4511, 53d Congress, 2d session, which proposed to authorize and direct the Secretary of the Interior, through a commission, to make allotments to the Indians upon the Uintah and Un-compahgre Indian Reservations, and provided for disposition of the unallotted lands. H. R. 4511 provided, in section 9 thereof:
That said Commissioners may adjust and settle any claims of the Indians against the United States, make adequate and just compensation to them for the relinquishment of any rights or claims which they may have in any lands within said Reservations, such payments to ■and provisions for the Indians to be out of the proceeds of the sale of the lands as hereinbefore provided; * * *
H. Res. 45, and H. R. 4511 were referred by Congress to the Secretary of the Interior and the Commissioner of Indian Affairs for reports. These officials reported to Congress their opposition to the enactment of the legislation in its present form, stating as grounds, inter alia, that the Indians residing upon the Uintah Reservation had title to their lands which should not be extinguished except after negotiation and purchase, and with the consent of the Indians.
Neither H. Res. 45 nor H. R. 4511 was enacted. However, Congress enacted the act of August. 15, 1894, 28 Stat. 286, 337, which directed the appointment by the President of a commission (1) to make allotments in severalty to the Un-compahgre Indians within the reservation referred to in *18 finding 10, with, a provision that the Uncompahgres would be required to pay $1.25 per acre for the lands so allotted, from the proceeds of the sale of their Colorado lands under the 1880 Agreement and Act; and (2) to “negotiate and treat with the Indians properly residing upon the Uintah Indian Reservation, in the Territory of Utah, for the relinquishment to the United States of the interest of said Indians in all lands within said reservation not needed for allotment in severalty to said Indians, * * *”
13. The commission authorized by the act of August 15, 1894, sufra, was appointed, but on January 8,1895, reported that it had encountered difficulty in explaining to the Un-compahgres why they would be required to pay $1.25 per acre for their allotments, whereas the Indians on the Uintah Reservation would not be required to pay for their allotments. As a consequence, no allotments or agreements for cession of unallotted lands were made.
14. Section 3 of the act of February 28,1891,26 Stat. 794, authorized the leasing of Indian lands “where [such] lands are occupied by Indians who have bought and paid for the same, * * On May 6, 1892, the Secretary of Interior ruled that lands of the Uintah Reservation were occupied by Indians who had “bought and paid for the same” within the meaning of the act. The validity of a lease upon Uintah Reservation lands made pursuant to this authority was upheld by the Supreme Court of Utah, 45 Pac. 348, against an attack that Uintah Reservation lands had not been “bought and paid for” by the Indians. On November 17, 1897, Assistant Attorney General Van Devanter issued an opinion to the Secretary of the Interior on the subject, in which he undertook a review of the various acts of Congress and executive and administrative action with respect to the tenure of the Uintah and White River Indians on the Uintah Indian Reservation. He held that the Uintah Reservation lands came within the purview of the act, stating:
It is clear that the Indians on this reservation gave up what were to them valuable rights for the purpose of securing a place for permanent homes, and some of the White River Utes relinquished rights to land in Colorado which had been guaranteed them by treaty stipulation. It would seem thus, that they may very *19 justly be considered as Indians who are occupying lands which they “have bought and paid for” within the purview of said act of 1891. The fact that this has heretofore been held by the supreme court of Utah, the State within which the lands are situated, is a persuasive argument in favor of the same conclusion by this Department. Again the fact that the holding of this Department has always been in favor of such ownership in these Indians tends strongly in favor of that conclusion now.
In 1898 the Secretary approved a lease expressly reciting that the Uintah Reservation lands had been “bought and paid for” by the Uintah and White River Ute tribes, and thereafter other leases were negotiated and approved.
15. The Indian Appropriation Act of June 10, 1896, 29 Stat. 321, 341-342, authorized the Secretary of the Interior to appoint a commission to negotiate with various Indians located on reservations in Montana and nearby states, and “with the Indians residing upon the Uintah Reservation in the State of Utah,” for the surrender of any portion of their respective reservations. The commission appointed pursuant to this act was directed by the Secretary of the Interior to negotiate with the Uintah and White River Bands of Ute Indians for cession of lands on their reservation to the United States for the allotment of the same in severalty to the Uncompahgre Utes.
The commission, on January 8,1898, negotiated an agreement with the Uintah and White River Ute Indians, whereby the Indians consented to “cede, sell, and relinquish to the United States,” for the use of Uncompahgre allotments, “all right, title, and interest which they may have to the lands necessary for such purposes * * *.” The agreement provided for payment to the Uintah and White River Utes at the rate of $1.25 per acre for the lands so ceded. This agreement was reported to Congress on January 21, 1898, Senate Document No. 80, 55th Congress, 2d session, but was never ratified.
16. The act of January 7,1897,30 Stat. 62, 87, directed the Secretary of the Interior to allot in severalty to the Un-compahgre Ute Indians on the Uncompahgre reservation, lands in the Uncompahgre reservation or the Uintah reser *20 vation or elsewhere in the State of Utah, and provided for the disposition of unallotted lands on the Uncompahgre reservation under the public land laws. Pursuant to this act and the act of June 4,1898, 30 Stat. 429 (see finding IT) and the Joint Resolution of June 19, 1902, 32 Stat. T44, amending the act of May 27, 1902, 32 Stat. 245, 263, (see findings 18 and 19) Uncompahgre Indians were given allotments in severalty upon the Uncompahgre and Uintah reservations, including ultimately 63,915.51 acres in allotments on the Uintah reservation by 1905, and the unallotted portions of the Uncompahgre reservation were opened for disposition under the public land laws. By the act of May 27,1902, as amended by the joint resolution of June 19,1902, the United States appropriated and paid to the Uintah and White River Utes $60,064.48, which had been received from the Uncompahgres for allotments on the Uintah reservation.
17. The act of June 4, 1898, 30 Stat. 429, directed and authorized the President to appoint a commission to make allotments in severalty with the consent of the Indians properly residing on the Uintah Indian reservation, “to the said Indians, and to such of the Uncompahgre Indians as may not be able to obtain allotments within the Uncompahgre Indian Reservation,” and also provided:
Sec. 2. That said commission shall also obtain, by the consent of a majority of the adult male Indians properly residing upon and having an interest in the said Uintah Indian Reservation, the cession to the United States of all the lands within said reservation not allotted or needed for allotment as aforesaid. The agreement for such cession shall be reported by said commission and become operative when ratified by Act of Congress; and thereupon such ceded lands shall be held in trust by the United States for the purpose of sale to citizens thereof: Provided, That the United States shall pay no sum or amount whatever for said lands so ceded. Said lands shall be sold in such manner and in such quantities and for such prices as may be determined by Congress: Provided, That the amounts so received shall, in the aggregate be sufficient to pay said Indians in full the amount agreed upon for said lands. All sums received from the sale of said lands shall be placed in the Treasury of the United States for said Indians, and shall be *21 exclusively devoted to the use and benefit of the Indians having interests in the lands so ceded.
18. The act of May 27,1902, 32 Stat. 245,263, provided for individual allotments and disposition of unallotted lands on the Uintah Eeservation, as follows:
That the Secretary of the Interior, with the consent thereto of the majority of the adult male Indians of the Uintah and the White Eiver tribes of Ute Indians, to be ascertained as soon as practicable by an inspector, shall cause to be allotted to each head of a family eighty acres of agricultural land which can be irrigated and forty acres of such land to each other member of said tribes, said allotments to be made prior to October first, nineteen hundred and three, on which date all the unallotted lands within said reservation shall be restored to the public domain: Provided, That persons entering any of said land under the homestead law shall pay therefor at the rate of one dollar and twenty-five cents per acre: And 'provided further, That nothing herein contained shall impair the rights of any mineral lease which has been approved by the Secretary of the Interior, or any permit heretofore, issued by direction of the Secretary of the Interior to negotiate with said Indians for a mineral lease; but any person or company having so obtained such approved mineral lease or such permit to negotiate with said Indians for a mineral lease on said reservation, pending such time and up to thirty days before said lands are restored to the public domain as aforesaid* shall have in lieu of such lease or permit the preferential right to locate under the mining laws not to exceed six hundred and forty acres of contiguous mineral land, except the Eaven Mining Company, which may in lieu of its lease locate one hundred mining claims of the character of mineral mentioned in its lease; and the proceeds of the sale of the lands so restored to the public domain shall be applied, first, to the reimbursement of the United States for any moneys advanced to said Indians to carry into effect the foregoing provisions; and the remainder, under the direction of the Secretary of the Interior, shall be used for the benefit of said Indians. And the sum of seventy thousand and sixty-four dollars and forty-eight cents is hereby appropriated, out of any moneys in the Treasury not otherwise appropriated, to be paid to the Uintah and the White Eiver tribes of Ute Indians, under the direction of the Secretary of the Interior, whenever a *22 majority of tbe adult male Indians of said tribes shall have consented to the allotment of lands and the restoration of the unallotted lands within said reservation as herein provided.
Said item of seventy thousand and sixty-four dollars and forty-eight cents to be paid to the Uintah and White Biver Utes covers claims which these Indians have made on account of the allotment of lands on the Uintah Bes-ervation to Uncompahgre Indians and for which the Government has received from said Uncompahgre Indians money aggregating sixty thousand and sixty-four dollars and forty-eight cents; and the remaining ten thousand dollars claimed by the Indians under an Act of Congress detaching a small part of the reservation on the east and under which Act the proceeds of the sale of the lands were to be applied for the benefit of the Indians.
Pursuant to this act, and amendments thereto, more fully set out hereafter, allotments in severalty, aggregating 39,349.84 acres by 1905, were made to the Uintah and White Biver Indians, and surplus lands (with the exception of forest reserve and reclamation withdrawals and certain mineral entries) were restored to the public domain, and opened for disposition under the public land laws for the benefit of the Indians.
Substantial amounts of these surplus lands were sold, and $1,184,996.33 in proceeds from such sales was set up for the benefit of the Indians under an account headed “Proceeds of Uintah and White Biver Ute Lands.” By Order of the Secretary of the Interior, August 25, 1945, 10 F. B. 12409, all undisposed-of opened lands of the former Uintah Beser-vation were “restored to tribal ownership for the use and benefit of the Ute Indian Tribe of the Uintah and Ouray Beservation in Utah * *
19. The joint resolution of June 19,1902, 32 Stat. 744, supplemented and modified the act of May 27,1902, supra. The resolution provided:
In addition to the allotments in severalty to the Uin-tah and White Biver Utes of the Uintah Indian Beser-vation in the State of Utah, the Secretary of the Interior shall, before any of said lands are opened to disposition under any public land law; select and set apart for the use in common of the Indians of that reservation such *23 an amount of nonirrigable grazing lands therein at one or more places as will subserve the reasonable requirements of said Indians for the grazing of livestock.
All allotments hereafter made to Uncompahgre Indians of lands in said Uintah Indian Reservation shall be confined to agricultural land which can be irrigated, and shall be on the basis of eighty acres to each head of a family and forty acres to each other Indian, and no more. The grazing land selected and set apart as aforesaid in the Uintah Indian Reservation for the use in common of the Indians of that reservation shall be equally open to the use of all Uncompahgre Indians receiving allotments in said reservation of the reduced area here named.
The resolution also provided that the $10,064.48 previously appropriated by the act of May 27,1902, supra, in satisfaction of claims of the Uintah and White River Tribes of Ute Indians, as set forth in the act, should be paid without awaiting the action of the Indians upon the program of allotments and disposition of unalloted and unreserved lands proposed by the act.
20. The act of March 3,1903,32 Stat. 982, 997-8, provided:
* * * That the Secretary of the Interior shall forthwith send an inspector to obtain the consent of the Uintah and White River Ute Indians to an allotment of their lands as directed by the Act of May twenty-seventh, nineteen hundred and two, and if their consent, as therein provided, can not be obtained by June first, nineteen hundred and three, then the Secretary of the Interior shall cause to be allotted to each of said Uintah and White River Ute Indians the quantity and character of land named and described in said Act * * *
21. The act of March 3,1905, 33 Stat. 1048,1069-1070, extended the time for opening the Uintah Indian Reservation, provided generally for the disposition of unreserved and unalloted lands under the general provisions of the homestead and town-site laws, the proceeds to be used for the benefit of the Indians, made other changes in the provisions of the 1902 Act for the disposal of unalloted lands, and provided for reservation of forest lands and reservoir sites prior to opening, as follows:
That before the opening of the Uintah Indian Reservation the President is hereby authorized to set apart *24 and reserve as an addition to the Uintah Forest Reserve, subject to the laws, rules and regulations governing forest reserves, and subject to the mineral rights granted by the Act of Congress of May twenty-seventh, nineteen hundred and two, such portion of the lands within the Uintah Indian Reservation as he considers necessary, and he may also set apart and reserve any reservoir site or other lands necessary to conserve and protect the water supply for the Indians or for general agricultural development, and may confirm such rights to water thereon as have already accrued: Provided, That the proceeds from any timber on such addition as may with safety be sold prior to June thirtieth, nineteen hundred and twenty, shall be paid to said Indians in accordance with the provisions of the Act opening the reservation.
22. Pursuant to the authority granted by the act of March 3, 1905, supra, approximately 1,010,000 acres of land within the Uintah Indian Reservation (more fully described hereafter) were added to and made a part of the Uintah Forest Reserve, by Proclamation of the President on July 14,1905, 34 Stat. Pt. Ill 3116. Quantities of timber were sold from time to time from such lands prior to 1920, and, pursuant to the act of March 3, 1905, supra, $63,024.83 in proceeds therefrom was transferred to accounts for the benefit of the Indians, as follows: $62,124.83 to an account “Proceeds of Uintah and White River Ute Lands,” and $300 to an account “Indian Moneys Proceeds of Labor, Uintah and Ouray Indians.”
23. Pursuant to the authority granted by the act of March 3, 1905, supra, approximately 93,000 acres of land in the Uintah Indian Reservation were reserved for “reservoir site necessary to conserve the water supply for the Indians, or for general agricultural development,” by proclamation of the President on August 3, 1905, 34 Stat. Pt. Ill 3141. By proclamation of August 14, 1905, this reservation was modified by excluding certain lands, thereby reducing the number of acres to approximately 60,160. By orders of May 13,1907, and November 11,1909, 56,868.51 acres of the 60,160 acres theretofore reserved by the above proclamations, were withdrawn, by the Secretary of the Interior pursuant to *25 Section 3 of the Reclamation Act of June 17, 1902, 32 Stat. 388, for irrigation works for the Strawberry Valley project.
24. By the act of April 4,1910, 36 Stat. 269, 285, Congress extinguished “All right, title and interest of the Indians” in the “lands in the former Uintah Indian Reservation in the state of Utah, which were set apart by the President for reservoir and other purposes under the provisions of the Act approved March third, nineteen hundred and five, * * * and which were by the Secretary of the Interior withdrawn for irrigation works under the provisions of the Reclamation Act of June seventeenth, nineteen hundred and two, in connection with the reservoir for the- Strawberry Valley project.” The area embraced within the above description constitutes 56,868.51 acres, and is the subject of the claim for just compensation in case No. 47570 of this court. The same act appropriated $1.25 per acre for the lands thus taken to be paid from the reclamation fund “for the benefit of the Uintah Indians,” subject to the same disposition as the proceeds of sales of lands in the former Uintah Indian Reservation, and payable in five annual instalments. Pursuant to this act, $71,085.65 was paid into the Treasury under the fund “Proceeds of Uintah and White River Lands,” in five equal in-stalments of $14,217.13 on February 21, 1912, October 28, 1912, June 27, 1913, September 22, 1914, and February 25, 1915, respectively. Under date of October 18,1948, the Acting Commissioner of Indian Affairs, in response to a call of this Court, reported that rentals or income from these lands were collected between August 3, 1905, and April 4, 1910, and were paid or credited to plaintiffs, as follows: January, 1908, $10,408; September, 1908, $8,728; September, 1910, $9,945.88. By intradepartmental letter dated August 21, 1911, the Assistant Director of the Reclamation Service stated that these rentals were paid to the Indian Service for the Indians because title was in the Indians until the act of April 4,1910, when title passed to the Reclamation Service, and thereafter rentals were considered revenue belonging to the Reclamation fund.
25. Between 1924 and 1929 several unsuccessful attempts were made to obtain passage of special jurisdictional legis *26 lation to permit the, Uintah and White River Bands of Ute Indians to bring suit in the Court of Claims for compensation for the 1,010,000 acres taken from the Uintah Reservation for the Uintah National Forest, pursuant to the Executive Order of July 14, 1905, supra. The first attempt was with the introduction of S. 3080, in 68th Congress, 1st session, a bill “for the relief of the Uintah and White River Tribes of Ute Indians of Utah” which proposed to confer “jurisdiction upon the Court of Claims to hear and determine the rights of said Indians under an agreement ceding lands embraced in their reservation to the United States and under acts of Congress relating thereto.” In reporting favorably upon the bill, the Senate Committee on Indian Affairs stated that the Uintah and White River Bands “held title jointly and in common” to the Uintah Reservation. Following a general description of the 1,010,000 acres of forest land taken in 1905, the Committee concluded that “The Government having taken these lands (which it was, under the agreement and the law, required to sell for the benefit of the Indians) for a forest reservation, it is, of course, responsible to the Indians for the value of the lands so taken.” S. 8080 passed the Senate and later the House with an amendment, but Congress adjourned before conferees could act.
In 1926 a bill of like import, S. 1924, was introduced in the 69th Congress, and passed the Senate. The House Committee on Indian Affairs reported favorably on the bill, stating that since 1881 the Uintah and White River Bands “held title jointly and in common” to the Uintah Reservation, and that “By subsequent acts of Congress the use and occupancy of the lands by these Indians were repeatedly recognized and confirmed.” The House, however, did not take final action upon the bill.
In 1928 S. 2482 was introduced and passed in the Senate for the relief of these Indians, reported by the House Committee on Indian Affairs, but withdrawn from further consideration when it came up in the House. H. R. 16985, introduced in the 70th Congress in 1929, passed both the House and Senate but received a pocket veto.
*27 26. These unsuccessful attempts to enact special jurisdictional legislation finally culminated in 1930 in the introduction of S. 615, 71st Congress, 2d Session, which provided for direct payment to the Uintah, White Biver, and Uncom-pahgre Bands of Ute Indians, at the rate of $1.25 an acre, for the lands which were taken pursuant to the Executive Order of July 14,1905, supra. This was the first legislative reference to the Uncompahgre Band of Ute Indians with respect to this claim. The report of the House Committee on Indian Affairs took cognizance of the hearings and reports in connection with the earlier attempts to get special jurisdictional legislation for the Uintah and White Biver Bands of Ute Indians and concluded that title to the Uintah Beservation since 1881 had been held “jointly and in common” by the Uintah and White Biver Bands. The Committee reported that “Their title to the land has never been challenged and has been repeatedly recognized by treaty, congressional acts, and court decisions.”
When the bill came before the House on the Consent Calendar, a question was raised with respect to the Indians’ title. Consequently, the bill was passed over without prejudice. When the bill was brought up for consideration again, there was inserted into the Becord a lengthy and documented “Deraignment of Title of Uintah, White Biver Utes, to Their Lands and In Support of S. 615 — Statements of Charles J. Kappler, Esquire, Attorney, Washington, D. C.,” after which it was observed that there was no “well-founded question” as to the title of these Indians, and the bill passed the House. There was no mention of the Un-compahgre Utes as having any interest in the lands, nor any explanation for their inclusion in the payment under the bill.
27. S. 615 was enacted into law on February 13, 1931, 46 Stat. 1092, providing for direct payment for 973,777 acres of the 1,010,000 acres of land taken for the Uintah National Forest on July 14,1905, in the following terms:
* * * That there is hereby authorized to be appropriated the sum of $1,217,221.25 for payment at the rate of $1.25 per acre, to the Uintah, White Biver, and Un-compahgre bands of Ute Indians in the State of Utah for nine hundred and seventy-three thousand seven *28 hundred and seventy-seven acres of land, belonging to such Indians being a part of the one million and ten thousand acres of land withdrawn from entry and sale by an Executive Order dated July 14,1905, and included within the Uintah National Forest. Such sum shall be in full satisfaction of all claims of said Indians against the United States with respect to such lands and shall, when appropriated, be apportioned by the Secretary of the Interior among the said bands of Indians in such amounts as in his opinion the interests of said bands require: Provided, That as to the balance of said one million and ten thousand acres, amounting to thirty-six thousand two hundred and twenty-three acres, which has heretofore been classified as coal lands, the Secretary of the Interior shall proceed with all convenient speed to ascertain the value thereof and report his findings with respect thereto to the Congress not later than six months after the approval of this Act for such action as to the Congress shall seem appropriate. The amounts so apportioned, less the amount of the attorneys’ fees determined as provided in Section 2, shall be credited to such bands on the books of the Treasury Department, shall bear interest at the rate of 4 per centum per annum and shall be disposed of in the same manner as now or hereafter provided by law for the disposition of other funds belonging to said Indians.
28. Pursuant to the act of February 13,1931, $1,217,221.25 was set up on the books of the United States Treasury under the heading “Payment to Uintah, White River, and Uncom-pahgre Ute Indians of Utah for Lands.” After payment of attorneys’ fees, $1,162,221.25 of said amount was transferred to the “Uintah, White River and Uncompahgre Ute 4% Fund, Utah.” $1,146,319.50 of said funds was distributed per capita to the Uintah, White River, and Uncom-pahgre Bands of Ute Indians in the years 1935, 1936, and 1938. The Uncompahgre Indians received the benefit of $439,466.88 of the $1,217,221.25 appropriated pursuant to the Act of February 13,1931, supra.
29. The area of land for which plaintiffs seek just compensation in this action consists of 973,777 of the 1,010,000 acres of the former Uintah Indian Reservation in Utah which were placed by defendant in the Uintah National Forest on July 14,1905. The balance of 36,223 acres which was separately classified as coal lands and for which no payment was *29 made by tbe act of February 13, 1931, is the subject óf a separate action, No. 47568. The legal description of the 973,777 acres, sometimes hereinafter called “subject lands” or “subject area”, is contained in paragraph 25 of the stipulation between the parties, filed January 4,1954, which paragraph is included in this finding as if fully set forth.
The subject lands are now within and. administered as parts of the Uintah and Ashley National Forests in Utah. The national forest boundaries within the subject lands have changed from time to time so that in years past the subject area has been part of the Uintah, Ashley, and Wasatch National Forests in Utah.
30. The Uintah Indian Eeservation as created by the Executive Order of October 3,1861, and the act of May 5,1864, included the entire drainage of the Duchesne (then Uintah) Eiver system. The original reservation was the major part of the Uintah Basin which extends eastward beyond the Indian reservation and includes the towns of Jensen and Vernal, the latter being about 12 miles east of the east boundary of the reservation.
The original Indian reservation was surrounded on the north, west and south by mountains, the crest of which was the reservation boundary. It was these mountain lands lying at higher elevations than the balance of the reservation, and being roughly in the form of a horseshoe open at the east end, which were added to the Uintah Forest Eeserve by the Proclamation of July 14, 1905. The interior boundary of the horseshoe-shaped area coincides with present boundaries of the Uintah and Ashley National Forests. The westernmost part of the subject lands is about 45 airline miles east of Salt Lake City, Utah. The lands extend eastward about 70 miles to a point about 45 miles west of the Utah-Colorado State line. The north arm extends northward to within about 12 airline-miles of the Wyoming State line. The area between the north and south arms is about 35 miles in width. The north arm is about 20 miles wide and the south arm about 10 miles wide at their widest points. The western part is irregular in shape, varying in width from less than one mile to about 15 miles.
*30 Generally speaking, the western part of the subject lands lies within the present boundaries of Wasatch County with a very small area in Utah County, and the north and south arms lie within the present boundaries of Duchesne County, with the extreme east end of the north arm being in Uintah County.
31. The elevation of subject lands ranges from about 7,000 feet at the inside boundary, which follows section and township lines rather than topography, to the crest of mountains which exceed 13,000 feet at the highest peaks. About 90 percent of subject lands lie at elevations above 8,000 feet.
The north arm extends about 40 miles along the south slope of the Uintah Mountains, an east-west range of the Rocky Mountains. The upper reaches of the north arm are rocky barren ridges and peaks (some exceeding 13,000 feet) rising abruptly from large glaciated basins located high in the Uintah Mountains. These basins have a shallow soil with a grass cover and some meadows. They drain into canyons which are steep and rugged in their upper areas and thereafter widen into areas extensively covered with good forage. The principal streams originating in the high basin areas and flowing southerly through the various canyons are, from east to west, the Whiterocks River, the Uintah River, the Yellowstone River, Lake Fork River, Rock Creek and the north fork of the Duchesne River, all of which are tributaries of the Duchesne River. Ridges extending southerly from the crest of the Uintah Mountains and separating the various canyons are high and barren or inacessible at their summits in the upper and middle areas of the north arm, with coniferous forests predominant on their slopes. In the lower parts are areas of aspen woodlands, sagebrush, mountain browse, grassland, and coniferous timber.
The western part of the subject lands is characterized by a succession of valleys on the east side of the Wasatch Mountains, with the elevation rising to a maximum of about 10,000 feet. The slopes are covered with forage desirable for the grazing of livestock, with extensive areas of aspen woodland having excellent undercover and with some coniferous forest, mountain browse and sagebrush areas. There is very little barren or inaccessible land. This part of sub *31 ject lands extends roughly from the north fork of the Duchesne River westerly, southerly, and then easterly into lands south of the Strawberry Reservoir withdrawal. Both the Strawberry Reservoir and coal-lands, withdrawals impinge upon this part of the subject lands, with the Strawberry withdrawal enclosed by subject lands on its north, west and south sides, and with one area of the coal lands completely surrounded by subject lands and the other adjacent to the east. The west fork of the Duchesne River fed by mountain streams runs through the northern part of this area of the subject lands. Numerous mountain streams throughout the other parts of this western area form the headwaters of Red Creek, Currant Creek and the Strawberry River, which rise on subject lands, flow through the coal lands and Strawberry site and into lower levels of the Uintah Basin, and in conjunction empty into the Duchesne River.
The south arm, considerably smaller in area and dimensions than the north arm, constitutes mountainous lands sloping northerly from a maximum elevation of 10,000 feet. In its principal canyons from west to east flow Willow Creek, Timber Creek, sources of Avintaquin Creek, and towards the eastern end, intermittent streams in Indian, Sowers and Antelope canyons, all part of the drainage system of the Uintah Basin. The south arm has areas of grassland, sagebrush, aspen woodlands, pinon-juniper, mountain brush, coniferous forest, and some wasteland.
32. Average precipitation on subject lands ranges from a low of 10 to 16 inches per year on the lower portions to from 25 to 40 inches per year on the higher elevations. The year 1905 was marked by better than average precipitation. The bulk of the precipitation falls in the form of snow between the months of October and May. Temperature extremes range from 40 degrees below to 95 degrees above zero Fahrenheit. For the greatest proportion of subject lands, the growing season extends from May 15 to September 15, with slightly longer growing season at the lowest elevations and considerably shorter above the timber line and in the highest elevations. Precipitation in the Uintah Basin, as in most western grazing areas, increases in relation to alti *32 tude, and a more abundant and desirable forage is generally found on the vast grazeable areas of the subject lands than is found on the lower elevations of the Uintah Basin.
33. The mountain streams distributed throughout subject lands provide year around flow, except for a few intermittent streams in the eastern portion of the south arm. Sufficient seeps exist in this latter area to permit summer grazing, but fullest utilization of this relatively small portion of subject lands is in spring and fall grazing, with all the rest well watered for summer grazing.
34. The soil is typical of mountain areas. The high peaks and ridges of the Uintah Mountains are largely sharp quartzite rocks, which are so hard they have withstood weathering. There is no evidence of a soil being formed. The high alpine basins have a very shallow soil. On the Uintah foothills the soil is of glacial origin, thickly dotted with rocks and boulders. At the lower elevations, and particularly on the west end and south arm, the soil is sandy or gravelly loam with some clay, the soil being deeper in the valleys and on the less steep slopes. Shale is found in the eastern portion of the south arm.
35. There was no land classification report on the subject area in 1905 or for about ten years thereafter. The earliest comprehensive classification reports were made by the United States Forest Service about 1915. Those reports show the following with respect to acreages of lands with various types of forage cover:

The difference between the total of the percentages and 100 percent reflects minor mathematical adjustments in rounding off figures and a negligible area of water surface acres and alienated land in the 1915 reports.
*33 38. The broad classification set forth in the preceding finding is not in accord with modern classification techniques. In accordance with present day practices, the subject lands are described as follows:
Grassland, type No. 1, on subject lands is characterized by open areas, free of trees or browse, on which the growth is principally mountain grasses or grasslike plants. Much of the grasslands is in the high alpine basins of the Uintah Mountains where the growing season is short.
Meadow lands, type No. 2, in the subject area are found principally in the vicinity of high mountain lakes, and along the flat areas adjacent to rivers. This cover differs from the grassland because of the abundance of moisture and the resulting differences in density and quality of forage. These wet lands are avoided by sheep but preferred by cattle.
Perennial weeds or forbs, type No. 3, in subject area are characterized by all types of high altitude weeds or forbs, growing in relatively open areas not dominated by shrub or tree growth. This type results from an encroachment of weeds into grasslands that have been overgrazed, although many of the invading weeds continue to supply palatable forage to livestock.
Type No. 4, or sagebrush lands, is one of the most common types found below the alpine zone in subject area. Sagebrush tends to replace other forage plants that die out from over use. The sagebrush plant itself is not highly palatable, but much good grazing is found in the area classified as sagebrush lands in subject area because of the good understory of grasses and weeds.
Type No. 5, mountain-browse lands on subject area, is characterized by palatable woody forage plants such as scrub oak, serviceberry, mountain mahogany, choke cherry, etc., generally growing on slopes. Some grasses and forbs are present in this type. Mountain browse lands usually support good grazing, unless slopes are too steep or rocky, providing better forage for sheep than for cattle.
Type No. 6, coniferous timber land, is characterized by the predominance of evergreen trees, other than pinon-juniper varieties. Englemann spruce and lodgepole pine, with some western ponderosa or yellow pine, make up the *34 coniferous cover on subject lands. Some of tbe coniferous timber areas support a usable understory of grasses and weeds, but others are so dense that no grazeable cover grows thereon.
Where timber of poor merchantable quality, as occurs in some places of subject lands, is so dense as to preclude grazing use, it may be classified in type No. 7, as inaccessible land, along with other types of land which support some forage but on slopes so steep or rocky as to make it unsuitable for grazing.
Type No. 8, barren lands, in the subject area consists of barren, high, rocky crags and peaks, generally above the timber line. Nearly all of the lands of this type in subject area are found in the north arm along the peaks and high ridges of the Uintah Mountains, and extending in places down into canyon gorges and walls.
There is relatively little type No. 9, or pinon-juniper land, in subject area because this type usually prevails at elevations below 7,000 feet. It is characterized by stands of evergreen trees of pinon and juniper variety, usually in shallow rocky soils. Some portions of this type do support a usable understory of dry land grass types, and occasionally some browse or sage. The principal pinon-juniper areas of subject lands are located in the east end of the south arm.
Type No. 10, broadleaf tree lands, in subject area is characterized by large stands of aspen or aspen and narrow leaf cottonwood, usually found where the soil is rather deep and of a loamy character. This type generally supports a very good understory of grass and browse and offers some of the best grazing resources on subject lands. It is usually located in areas accessible to livestock, and extensive areas of this-type are to be found in the western part in the drainages of the west fork of the Duchesne Eiver, Eed Creek, Current Creek, and the Strawberry Eiver, and also substantial areas in the southern parts of the north arm.
37. Some changes in the nature and quality of the cover upon subject lands have occurred in the years since 1905. Sagebrush, rabbit brush, and forbs have invaded areas previously occupied by grassland, and the quality of the forage has somewhat deteriorated. The timber has matured, but *35 very slowly. With the exception of these changes in forage,, physical conditions on subject lands have remained relatively stable.
38. Portions of the subject lands had been used by non-Indians for sheep and cattle grazing since about 1880'. In the 1880’s prior to any official leasing to non-Indians,, thousands of cattle were grazed by white owners from Strawberry Valley at the western end of the original Uintah Reservation to Green River, which runs in a southerly direction some miles east of this reservation. Shortly thereafter thousands of sheep were trespassed upon the high summer ranges at the western end of the reservation. In 1893, the first official leases were executed, permitting cattle grazing over the western end of the reservation, including large portions of subject lands. Sheep trespassing continued extensively, so that the trespass use during some years actually exceeded the grazing use under the cattle leases. In 1900, the western end of the reservation, constituting approximately 800,000 acres, including large areas of subject lands, was divided into three ranges and leased to non-Indian livestock operators for the grazing of sheep and cattle, and in 1901, another area of approximately 80,000 acres lying to the east of the other three ranges was leased. Grazing use under these leases continued until July 14,1905, and beyond. This earlier grazing use of subject lands tended to center in the better grazing lands in the western end of subject area from the north fork of the Duchesne around to the Avintaquin drainage. Some grazeablé portions of subject land were still relatively unused as of 1905.
39. The condition of the range over subject lands as a whole in 1905 was good. Forage growth was better in quantity and quality than at the present time. Overgrazing was slight and highly localized.
In the years after 1905, and especially during World War I, the range on subject area deteriorated under extensive grazing. Beginning in the 1920’s, the Forest Service interposed a policy, which has continued to the present, of progressively reducing the number of livestock permitted to graze in the area, and reducing the grazing season. The average grazing season of the area as a whole is presently *36 from about mid-June through late September. However, in or about 1905, the average grazing season extended from early May to October, with some fall and spring grazing. The present grazing use of the subject area is substantially helow its grazing use in and around 1905.
40. Under modern range management practices, the grazing resources of subject area are measured in terms of ■carrying capacity, or ability to support livestock for a given length of time, expressed in terms of acres required per .■animal unit month of grazing. A prospective purchaser in 1905, would not have estimated grazing resources of the subject area in terms of acres per animal unit month, but would have attempted to make some inventory of the available forage resources in terms of the number of livestock which could be grazed upon the range. Such an estimate by a well-informed purchaser in 1905 would have shown grazing resources equivalent to 181,000 animal unit months of grazing, expressed in modern terminology, or an acreage requirement of approximately 5.43 acres per animal unit month of grazing. An animal unit month is the amount of forage required to feed an average adult cow or horse, or five adult sheep for one month.
41. Coniferous timber, other than the pinon-juniper type, makes up the merchantable timber resources on subject lands. The conifers occur in four major types; lodgepole pine, Engleman spruce, ponderosa or western yellow pine, and Douglas fir. The aspen growth occurring over extensive areas of subject lands has no commercial timber value.
Lodgepole pine comprises the largest area and percent of merchantable timber on the subject lands. It predominates in the northeast sections of subject area, in the Ashley National Forest. The Engleman spruce type often occurs interspersed with the lodgepole pine, but also grows in substantial pure stands in more favorable moisture situations, such as the north slopes of the small creeks at higher elevations and at the head of the upper basins. The yellow pine, which is the most valuable commercial timber, occurs in open and irregular stands in the Yellowstone, Dry Fork, and Uintah River areas, generally along the lower borders of the subject area. The Douglass fir type occurs most fre *37 quently in the lower areas about tbe Strawberry Reservoir site, and along the southern arm of subject lands.
42. As of July 14, 1905, there were from 1,200,000 to 1,500,000, thousand-board-feet of timber on subject area, to which Forest Service officials, in 1915 and 1916, attributed a total value of $1,218,625. These value estimates, apparently based upon an attempt to estimate the intrinsic value of the timber, are not a reliable indicia of the market value of the timber lands in 1905, but do indicate that there was substantial timber on subject lands of merchantable quality.
Timber resources in forest areas on the west slopes of the Wasatch Mountains, west of the subject lands, had been heavily exploited in the years prior to 1905. These forest areas were accessible to the populated areas between Salt Lake City and Provo, Utah, as well as settlements on the west slopes of the Wasatch Mountains. The timber resources of the subject lands, being within the original Uin-tah Indian Reservation, had never been offered for sale, and there was little local demand and inadequate transportation facilities for commercial lumbering operations. Prior to July 14, 1905, the pending opening of large areas of the lower lands of the reservation for settlement, combined with the expected construction of a railroad through the Uintah Basin, created an expectancy of a demand for the virgin timber resources of the subject lands, and lumbering men were giving consideration to the commencement of lumbering operations.
The Forest Service received the average sum of $4,988 annually during the years 1906 through 1910 on sales of timber from subject lands, and, in addition, permitted free use to settlers of the Uintah Valley of timber averaging in value about $2,000 per year in the early years of the Forest Service Administration. Without rail facilities, substantial commercial operations failed to develop, and timber cutting was largely limited to local demand, but as late as 1915, construction of rail facilities and timber development were still expected.
43. The first permanent non-Indian settlements in Utah commenced with the arrival of the Mormon pioneers on July 24,1847, on the site of Salt Lake City. From this cen *38 ter of activity and growth, the Mormon settlers soon established principal communities in the areas of Ogden, Salt Lake City and Provo, located in relatively extensive and level valley areas extending north and south at the foot of the western slopes of the Wasatch Mountains. The Territory of Utah was organized in 1850. Grazing activities from the population centers reached into the west slopes of the mountains adjacent to the western part of the subject lands as early as 1859. Wasatch County, adjoining subject lands to the west, was organized in 1862. To the east of the original Uintah Reservation, permanent settlements at Jensen and Vernal were founded prior to 1880, and Uintah County was organized in 1880.
Prior to July 14,1905, the Uintah Indian Reservation had not been opened to settlement of any kind by non-Indians. The only white population in the reservation consisted of Indian Service personnel, grazing lessees, soldiers stationed at Fort Duchesne and, possibly, mineral lessees. On July 14, 1905, it was known that the unallotted and unreserved lands within the Uintah Indian Reservation were to be opened to settlement under the public land laws the following month. It was anticipated that this would bring in an additional population.
44. In the years immediately preceding and following July 14, 1905, the area environing subject lands was undergoing a period of population increase. Between the years 1890 and 1900, Wasatch and Uintah Counties, adjoining subject lands to the west and east, increased in population respectively from 3, 595 to 4,736 and from 2,762 to 6,458. Between 1900 and 1910, Wasatch County increased further from 4,736 to 8,920, and Uintah County from 6,458 to 7,050.
The population of Utah increased from 276,749 in 1900 to 373,351 in 1910, with approximately 35 percent of the total population in the valleys from Ogden to Salt Lake City to Provo, approximately 45 to 70 miles west of the western part of subject lands.
45. In 1905, transportation in the original Uintah Indian Reservation was limited to wagon roads which provided access to nearly all parts of Uintah valley below 7,500-foot elevation. Only two wagon roads crossed the subject lands, *39 one through, the western part to Heber, Utah, about 14 miles west of subject lands, and the other through the south arm to Price, Utah, about 18 airline miles south of the south arm of subject lands. This latter road was used to transport supplies for the Indian Service. Both of the roads through subject lands were often impassable in winter because of snow. The existing roads were adequate for grazing use of subject lands, but were not adequate for commercial lumbering operations.
46. There were no railroads into or through the subject lands or the Uintah basin in 1905. The main line of the Denver and Rio Graiide Railroad from Denver to Ogden had been completed in 1883, affording shipping points about 4 to 6 miles south of the south arm of subject lands. In 1899, a branch line of this railroad was extended to Heber, 14 miles west of the western part of subject lands. The north arm remained rather remote from rail facilities. Although this railroad was adequate for the shipping of livestock grazed upon subject lands; it was inadequate for commercial lumbering operations.
47. Construction of a railroad through the Uintah Yalley was expected in 1905. The projected line of the Denver and Salt Lake Railroad, from Denver to Salt Lake City, via the Uintah Basin, commenced construction in 1902, and was scheduled for completion by 1912. While actual construction of this line, because of financial difficulties, terminated at Kremling, Colorado, in 1906, and ultimately at Craig, Colorado, in 1913, planned construction through the Uintah Basin was fully expected for many years after 1905. Anticipating this scheduled construction, the Uintah Railroad had been constructed in the years 1904 and 1905 from Mack, Colorado, to Watson, Utah, 60 miles east of subject land, with the original intention of connecting the Denver and Salt Lake Railroad, being built from Denver, with the Denver and Rio Grande Railroad at a terminus in the Uintah Yalley. These prospects of railroad construction exerted a favorable influence on economic conditions in the area en-vironing subject lands in 1905.
48. July 14, 1905, was in a period of favorable economic trends, both national and local. Real estate values and inter *40 est rates were bigh. Price levels for commodities were generally steady and rising slowly. Livestock population was near peak levels. Per-head values for cattle were temporarily depressed, but demand was steady and prices for slaughtered steer products were increasing. Sheep values per-head and for slaughtered products were increasing.
Between the years 1900 and 1910 the number of farms in Wasatch County practically doubled, while increasing by about 20 percent in Uintah County, which included at that time all of the farm land in the Uintah basin. Over the same period the number of irrigated acres more than doubled in both counties, and value of farm lands increased several fold.
49. In 1905 summer grazing lands were in demand in Utah, and especially in and about the area of subject lands. Abundant winter grazing lands were available, with summer ranges relatively scarce. Some Utah livestock operators who operated in the general area of subject lands had been required by lack of availability of sufficient summer grazing lands to move their livestock operations into nearby states.
50. The subject lands, particularly in the Uintah Mountains, had been thoroughly prospected for minerals prior to 1905. In 1905 there were no known mineral deposits which added a separate value to the subject lands and no separate mineral value has been claimed by the plaintiffs.
51. As of July 14,1905, subject lands, or portions thereof, were potentially adaptable to several economic uses, including livestock grazing, timber cropping, water shed protection, water storage, water power and recreational use. The highest and best use of subject lands was as a summer grazing pasture for sheep and cattle. The timber resources could have been exploited without detracting from grazing use, but demand for this timber in 1905 was slight, and the timber resources would have added value to subject lands in relation to the extent that the expected coming of the railroad would cause prospective purchasers to forecast a future demand. There was not sufficient demand for the water development and recreational resources of subject area, as such, to have had a measurable effect on the market value of subject lands in *41 1905, but the presence of sucb resources would have had a generally favorable influence on prospective purchasers.
Both parties accepted market value as of July 14, 1905, as the standard for valuation of subject lands. The evidence adduced by both parties, in determining market value, took into consideration the physical characteristics of the land and the uses to which it was adaptable in 1905. Both parties agreed that market value was best evidenced by market data — i. <?., the price paid for comparable lands, similarly situated, at or near the date of valuation.
52. The principal appraisal witnesses in this case were Watson A. Bowes, called by plaintiffs, and Werner Kiepe, called by defendant. Each prepared an elaborate appraisal report, plaintiffs’ exhibit 41, being the Bowes report, and defendant’s exhibit 1, being the Kiepe report. In addition, the plaintiffs adduced the testimony of Dean Mahaffey and Dr. Franklin S. Harris as to their opinions of the value of subject lands.
The ultimate opinions of these witnesses as to the market value of the 973,717 acres of subject lands as of July 14,1905, were from the lowest to the highest as follows:
Kiepe, $730,000, or about $0.75 per acre;
Bowes, $1,305,000, or about $1.34 per acre;
Mahaffey, $1,704,000, or about $1.75 per acre; and
Harris, $2,011,389, or $2,065 per acre.
53. Mr. Bowes, a member of the real estate firm of A. G. Bowes & Son, Denver, Colorado, was a professional real estate appraiser with 23 years’ experience, having entered that field with the above-named firm upon his graduation from Washington and Lee University in 1931 with a Bachelor of Science degree in business administration. In 1933 and 1934 he successfully completed two courses in real estate appraisal offered by the Denver Board of Kealtors, and in 1940 graduated from such a course at Tulane University. He is presently in charge of the appraisal section of his firm, and has had a varied experience in all phases of real estate business.
He has been a member and officer of various city, state, and national professional associations, serving as president of the Denver Kealty Board in 1934, president of the Denver *42 Board of Realtors in 1951, president of the Colorado Association of Real Estate Boards in 1947, director of the National Association of Real Estate Boards for three years and a member of the executive committee thereof, first member from Colorado of the American Institute of Real Estate Appraisers in 1940, and national president of the latter organization in 1958, after having served three years as a member of its board of governors and two years as chairman of its education committee.
From 1941 to 1948 he taught courses at the University of Denver in real estate appraising and real estate principles and practices. He also lectured on real estate appraising at Boston University in 1947, at Washington University of St. Louis in 1949, and at Indiana University in 1952, in courses sponsored by the American Institute of Real Estate Appraisers.
Mr. Bowes’ experience included appraisal services performed for several national life insurance companies, a number of state and national banks, and savings and loan associations of Denver, for oil companies, railroads, and others.
His real estate appraisal experience also includes services for several departments and agencies of the United States, and various Colorado and Denver governmental agencies.
Mr. Bowes had extensive experience with western grazing lands and ranches. He personally owned two farms and was a partner in a third in Colorado, has served as a consultant on the acquisition or disposition of large ranches in Colorado and Wyoming, and also as consultant of the Colorado State Board of Land Commissioners with respect to its policies in leasing or disposing of state lands, a great majority of which were grazing lands.
Among the most important appraisals done by Mr. Bowes involving large areas of western ranch and grazing lands were the Colorado Big Thompson Diversion project involving large areas of mountain grazing land on the western slope of the Rocky Mountains in Colorado, one million acres of land in Arizona for an air gunnery range, the Los Alamos Ranch School in New Mexico, 200,000 acres of land near Albuquerque, New Mexico, acquired for-bombing range pur *43 poses, 857,000 acres of farm land and livestock grazing land in southeastern Kansas, several prisoner-of-war sites in New Mexico and Colorado, a large portion of the land now comprising Camp Carson at Colorado Springs, Colorado, and the appraisal of approximately four and one-half million acres of grazing land in western Colorado in connection with a suit in this court, No. 45585, Confederated Bands of Ute Indians v. The United States.
The appraisal of the lands in western Colorado for the Ute Indians was made by Mr. Bowes in 1946 and 1947 for a valuation as of a date in 1938; and the appraisal of the extensive areas of southeastern Kansas was made in 1952 for a valuation as of 1865. Mr. Bowes has also made several appraisals for private clients in tax cases before the Internal Eevenue Service, in which it was necessary at a recent date to establish the market valué of property as of March 15, 1913.
Mr. Bowes has previously qualified to testify as an expert appraiser before this Court, the United States District Courts for New Mexico and Colorado, several state District Courts of Colorado, and before the Indian Claims Commission. His previous appraisal experience has been in Colorado, New Mexico, Arizona, Montana, Wyoming, Oklahoma, Florida, Virginia, and the Province of British Columbia.
54. The purpose of Mr. Bowes’ appraisal was to arrive at an opinion of the market value of subject lands as of July 14,1905. Mr. Bowes understood “market value” to be “ * * * the highest price, fairly determined in terms of money, which could be commanded for the property by a seller who is willing and able but not obliged to sell and is well informed as to the rights and benefits inherent in or attributable to the property, from a buyer who is willing and able but not obliged to buy and is also well informed as to the rights and benefits inherent in or attributable to the property if the property is exposed to sale in the open market for a reasonable length of time.” In arriving at his opinion he used two approaches, accepted and recognized as standard approaches by the appraisal profession. The first approach was the comparative or market data approach, which assumes that the market value of the property under appraise *44 ment tends to be set by the price at which, similar properties have been sold. It was considered by him to be the most reliable approach to market value. The second approach was the income or productivity approach, which assumes that the market value of land tends to be set by the amount of rental income that it is capable of producing. This approach requires the collection of data on the actual and potential rentals from subject area, analysis of the relationship between the rentals and market price for comparable areas and types of land, and the capitalization of the rental received by the property under appraisement by the gross rental multiple thus derived. Because it did not reflect all the aspects of ownership, the productivity approach in this instance was used primarily as a check on the market data approach.
55. In order to familiarize himself with all of the pertinent characteristics of the subject lands, Mr. Bowes and other technical and professional assistants under his direction made an elaborate analysis of the physical characteristics, economic characteristics, and the economic uses of the subject lands and the environing vicinity, based upon physical inspection and upon extensive documentary research, endeavoring to ascertain the conditions existing as of 1905.
56. After obtaining the correct legal description of the property and plotting it on various maps, Mr. Bowes made a preliminary survey of the property in April of 1952, including a field trip to the property, a preliminary inspection of the areas in which comparable sales data might be obtainable, contacts with county recorders’ offices and title companies to ascertain the availability of comparable sales data in the area environing subject lands as of 1905, and an investigation of the availability of maps, reports, and historic and economic data. This preliminary survey and investigation required approximately 12 days. Mr. Bowes then formulated a plan for the appraisal of subject area to be conducted by him or by other employees under his supervision.
. 57. Mr. Bowes, or his associates under his supervision, collected extensive data relative to the historical background of the subject area, the economics of the period, the population *45 trends and statistics of the area at the date of appraisal, information relative to railroads and other transportation facilities, and information with respect to agricultural prices. He also assembled extensive documents bearing specifically upon the physical characteristics of subject lands, including maps obtained from the Forest Service and the Soil Conservation Service showing the types of cover on subject lands and adjoining private lands, aerial mosaics and U. S. G. S. maps showing general contour and topography, reports of Forest Service and other government agencies describing subject lands, the timber, grazing, and water resources found thereon, and the income received from rentals of the subject lands.
58. Following assembly of the pertinent documentary data, an inspection of the subject lands was undertaken by Mr. Bowes, and Mr. Dean Mahaffey under Mr. Bowes’ supervision. Mr. Bowes personally spent several days in the field traversing substantially all of the areas of subject lands which could be reached by a four-wheel-drive vehicle. Mr. Mahaffey, a qualified and experienced range inspector and land classification expert, under Mr. Bowes’ supervision, spent additional time covering the inaccessible portions of subject lands on foot and by horseback, and reported his findings to Mr. Bowes. Mr. Bowes’ physical inspection of the subject area was complemented by two air views of the subject area, involving approximately 8 hours of flying time spent in viewing the entire subject area at low altitudes with maps and surface field inspection notes in hand as guides.
59. To better familiarize himself with conditions prevailing in the subject lands in 1905, Mr. Bowes conducted interviews with 25 to 30 persons who had lived in the area or operated livestock on subject lands, or were engaged in business operations in subject area at that time, discussing with such persons the physical characteristics of subject lands, their carrying capacity as of 1905, and general economic conditions prevailing at about that time.
60. The data and information produced by field inspection of the lands, by documentary research, and by interviews with persons acquainted with the subject area in 1905 were then classified, organized, and analyzed by Mr. Bowes with *46 the assistance of Mr. Mahaffey and Mr. David L. Montonna, and prepared for presentation and report in the way of narrative report, charts, tables, and maps. The investigation, research, analysis, and preparation of the appraisal report involved 421 man-days of work.
61. Mr. Bowes’ knowledge of the physical characteristics, economic environment, and economic use of the subject lands as of 1905 was substantially in accord with the preceding findings of fact covering such subject matters.
62. Mr. Bowes and his associates under his supervision made an extensive investigation of purchases and sales of summer grazing lands located within the Uintah Basin, in areas surrounding and adjacent to the subject area, and elsewhere in the states of Utah, Colorado, and New Mexico, limiting the transactions generally to those occurring in the period between 1895 and 1915.
They obtained from county recorders, from abstract and title companies, and from interviews with individuals, information involving some 1,000 transactions appearing to them to be free market sales of comparable grazing lands. These transactions were analyzed and screened with the object of eliminating obvious family transactions and other transactions where the consideration was not mentioned in the deed and could not be otherwise verified by interviews with persons involved, or where the consideration may have been affected by abnormal factors. The lands involved in' the remaining transactions were inspected to eliminate cultivated and irrigated lands, lands with extensive improvements, and lands not generally comparable in terms of cover-type, economic use, economic environment, elevation, and precipitation. The remaining areas were then mapped and inspected for cover type classification, based upon personal inspection and upon official type maps by the Forest Service, the Grazing Service, the Bureau of Land Management, and the Soil Conservation Service. After all eliminations, there remained 442 transactions which Mr. Bowes considered to be sufficiently comparable to give a reliable indication of value. Wherever possible, parties or persons otherwise having knowledge of the transactions were interviewed to confirm *47 the data derived by the investigation process. Because of the early date of-many of these transactions, confirmation could not be obtained from parties to a substantial number of the transactions, but all of the 442 transactions selected by Mr. Bowes for comparison and analysis were either confirmed in some manner to his satisfaction, or were adequately recorded in the deed in such a manner and under such circumstances to satisfy Mr. Bowes as to the reliability of the data contained therein.
63. In order to relate the varying physical and economic characteristics of these transactions more precisely to valuation of subject lands as of 1905, Mr. Bowes classified these 442 transactions into three groups, as follows: (1) 12 private sales involving large tracts of mountain grazing land, located in Utah and New Mexico at varying distances from the subject area; (2) 210 private transactions involving sales of small areas of grazing lands in six counties adjacent to or bordering subject area; and (3 ) 220 private transactions involving sales of small areas of mountain grazing lands, elsewhere in Utah and in western Colorado.
64. Included among the 442 private sales considered by Mr. Bowes were 12 sales involving relatively large areas of land, ranging from 6,252 to 99,289 acres. Because of their size, their plottage value for grazing use, and their inclusion of all types of cover found upon subject lands, Mr. Bowes considered these sales as giving the most reliable indication to the 1905 market value of subject lands.
65. Included among the 12 large sales known to Mr. Bowes were nine sales concerning which plaintiffs adduced testimony of witnesses in verification of the nature and amount of property involved and consideration paid. These nine sales are described in this finding.
One transaction, verified by the testimony of a stockholder of the grantee company, who was the person in direct charge of grazing operations on the lands before and after the sale, involved 17,199 acres of land sold in 1911 for $137,-500, located adjacent to the La Sal National Forest in San Juan County, Utah, about 114 airline-miles from the south arm of subject lands. The land ranges in elevation from *48 8,000 to 10,000 feet and bas precipitation of from 25 to 35 inches per year. The area is rolling in character with some steep portions, with relatively less steep and inaccessible areas than subject lands. Two creeks running through the area supply water comparable to the well watered areas of subject lands. Cover-types on this area are comparable to cover-types found in subject area, including aspen with interspersed areas of grassland, mountain browse, and coniferous timber. The land is generally comparable to the better portions of subject lands and had a carrying capacity of about two acres per animal unit month based upon actual experience in 1905. Some fencing, one sheep corral, and a summer cabin were on the land at the time of purchase, reasonably valued at about $9,500, leaving an average price for the unimproved land of $7.44 per acre.
Six of the large sales are located within a large Spanish land-grant area known as the Tierra Amarilla in Rio Arriba County, New Mexico, and are adjacent to or near the Carson National Forest. These sales are located adjacent to or near the northern boundary of New Mexico from 105 to 140 miles east of the southeastern corner of Utah, averaging in distance about 294 airline-miles from the south arm of subject lands. Arlington Land Company was the grantor in each transaction. The confirming witness for each transaction was and had been an agent for the grantor since 1916, after the transactions in question, was thoroughly familiar with the nature and extent of the lands involved, but with respect to considerations paid, stated that the policy of the grantor company was to recite correctly the considerations in its deeds involving parts of the Tierra Amarilla grant because of the fact that there existed an overall trust on the entire grant which would have to be released in part as consideration was paid on the sale of a part thereof. Each deed on these six transactions is in evidence, limited by the offer of the plaintiffs “not as independent evidence of the consideration recited therein.” Mr. Bowes’ sources of information for the considerations were the deeds and an interview with the confirming witness. The acreages, dates, and purchase price of these sales were as follows:

*49

All of these lands were unimproved and were purchased for grazing purposes. They were summer grazing lands with a grazing season comparable to subject lands, ranging in elevation from 7,500 to 10,000 feet and receiving annual precipitation of from 20 to 35 inches. The cover on these lands was comparable to the cover found in areas of subject land, being characterized by sagebrush, aspen, coniferous timber with grasslands interspersed, and some meadow land. There were within these sales areas of waste timber, barren outcroppings of rock, and steep, rocky, and inaccessible canyons, comparable to some of the waste areas found in the north arm of subject lands. Some stands of commercial timber more valuable than the timber resources on subject lands were found on these New Mexico sales at the time of the transaction, but in all such instances the timber rights were reserved to the grantor. Each tract either was crossed by or was in close proximity to a railroad. The grazing capacity of these lands was between five and six acres per animal unit month.
Two of the nine large sales involved the same tract of land, 15,020 acres located approximately 10 miles northeast of Las Vegas, New Mexico, and 414 airline-miles from the south arm of subject lands, sold in 1905 and resold in 1907. The-two deeds are in evidence on plaintiff’s conditional offer as not being independent evidence as to the considerations recited therein. The 1905 deed recited that Alphonso Hart, the grantee, was an attorney who had rendered legal services for the town of Las Vegas in perfecting its title to a Spanish grant which included the land conveyed, and had made claim for a fee of $40,000. This deed further recited that the conveyance was made in recognition of the “validity and justness” of the claim. The conditions of this 1905 sale *50 were confirmed in the testimony of Albert T. Eogers, who acted as attorney for Mr. Hart to collect his claimed fee. He testified that the pertinent tract was conveyed in full settlement of the $40,000 claim. The 1907 deed, received in evidence upon the same conditional offer of plaintiffs, was a conveyance of the same lands by Mr. Hart to one Morley, with the consideration recited therein as $10. Mr. Bowes testified that the actual consideration was $45,060, which amount was substantially confirmed by Mr. Eogers in that he had been consulted by Mr. Hart concerning the transaction and advised by Mr. Hart and the grantee and his attorney that $45,000 was the consideration. The land was used for grazing and there were no improvements on it at the time of these transactions, although the land was of such nature that Morley subdivided the tract a year or two after his purchase, and some dry farming projects were established thereon. The tract ranges in elevation from 6,700 to 7,000 feet with annual precipitation of about IS to 17 inches. It had a carrying capacity of three acres per animal unit month. The cover was primarily sagebrush and grassland, with the higher elevations carrying a sparse cover of pinon-juniper. The terrain was relatively level, but gently sloping in the areas covered with brush and pinon-juniper. The 1905 and 1907 sales prices of $40,000 and $45,060 averaged respectively $2.66 and $3.00 per acre.
66. In addition to the nine large sales, concerning which confirming witnesses were called by plaintiffs, Mr. Bowes had knowledge of three additional large sales of unimproved mountain grazing land in Colorado and New Mexico, which he took into consideration in formulating his opinion. The first of these was a transaction between the Costilla Estates Development Company and the Adams Cattle Company which, according to Bowes, involved the sale of 68,000 acres of unimproved mountain grazing land in Taos County, New Mexico, in the year 1911, for a price of $170,000, or an average of $2.50 per acre. The land involved, located adjacent to the north boundary of New Mexico about 175 miles east of the southeast corner of Utah, and about 366 airline-miles from the north arm of subject lands, was summer grazing land in the Sangre de Cristo Mountains, ranging in eleva *51 tion from 8,000 to 12,800 feet, and receiving from 20 to 40 inches of precipitation annually. It had a combination of almost every cover type found upon subject lands, with the higher elevations containing steep and rocky river canyons. The carrying capacity was three acres per animal unit month.
The second was a transaction in 1909 between Valles Land Company and the Bedondo Development Company, which Mr. Bowes’ investigation disclosed involved the sale of 99,289 acres of unimproved mountain grazing land in Sandoval and Bio Arriba Counties in New Mexico, located 40 to 45 miles north of Albuquerque and about 342 airline-miles from the south arm of subject lands, for a consideration of $297,512, or an average of $3 per acre. The land was excellent summer grazing range, located at elevations from 8,200 to 11,250 feet, with precipitation of about 30 to 40 inches per year. It was characterized by grass, meadow, sage, browse, and coniferous timber, and had an estimated carrying capacity of two acres per animal unit month, being exceptionally good grazing land.
The third of these transactions was in 1907 between the San Luis Valley Land and Mining Company and Lipencott, which, according to Bowes, involved the sale of 99,289 acres of mountain grazing land in the San Luis Valley, located in south central Colorado about 294 airline-miles from the north arm of subject lands, for a total consideration of $550,000, including $75,000 worth of improvements, leaving $475,000 for the unimproved land, or $4.78 per acre. The land varied sharply in elevation, rising from a valley floor at 8,000 feet to the top of the Sangre de Cristo range at .about 14,000 feet. Much of the land in the higher elevation was steep and rocky. Some of it was entirely unsuitable for grazing. It had grass, sage, browse, coniferous timber, and some pinon-juniper and aspen cover, with an estimated carrying capacity of three and one-half acres per animal unit month.
67. The 12 large sales testified to by Mr. Bowes as a basis for his opinion involved some 402,623.8 acres of land for a total consideration of $1,334,457.50, or an average of $3.31 per acre. The nine sales in this category, concerning which confirming witnesses testified, involved a total area of 136,- *52 045.8 acres, for a total consideration of $891,945.50, or an average of $2.88 per acre.
For the purpose of relating the price paid for each one of the 12 large tracts to the value of the subject lands, three adjustments were made by Mr. Bowes. The first adjustment concerned the date of each sale in relation to the valuation year, 1905. In this connection, Mr. Bowes relied upon statistics derived from publications of the United States Department of Commerce providing national economic in-dices for each of the years 1890 through 1915, covering general price index of commodities, farm products, cattle per head, sheep per head, horses per head, steers per cwt., and lambs per cwt. Considering that a combination of all these-indices was important with respect to the valuation of subject lands, he computed the average of these indices for each of the years covered. Each price index and the average of all indices for each year were adjusted so that the year 1905 was represented by the figure 100. Using the related average of all indices for the year of each sale, as compared with the average of all indices for 1905, Mr. Bowes employed a time adjustment factor with respect to the per acre price of each sale. For example, the first above-mentioned of the 12 large sales (see finding 65) took place in the year 1911. The average of all indices for the year 1911 was computed by Mr. Bowes at 125, as compared with the base year of 1905 at 100. The time factor used on this sale was 80 percent and the $7.44 price per acre on that sale was thus reduced to $5.95. Each of the 12 sales was adjusted accordingly, except the 1905 sale, and the time factor adjustments ranged from 72 percent to 86 percent.
The second adjustment made by Mr. Bowes was for the purpose of further relating the per acre price on each of the 12 large sales on the basis of the relative size of the tract compared to the 973,777 acres of subject lands. Mr. Bowes conceded that a tract as large as subject lands would be more difficult to sell than tracts the size of the 12 large sales. With respect to the same one of the 12 large Sales used as an example on the first adjustment, the readjusted price of $5.95 was reduced by a size factor of 90 percent to $5.36. Each of the 12 large sales was adjusted by a size factor of *53 90 percent, except the three set forth in finding 66 on which the size factor adjustment was 95 percent.
The third adjustment made by Mr. Bowes concerned relative carrying capacity. The carrying capacity of the example tract was two acres per animal unit month, as stated in finding 65, whereas the carrying capacity of subject lands was 5.43 acres per animal unit month, and 2.715 times as much of the subject land was required to carry one animal unit month as was required of the example tract. Consequently, the carrying capacity of subject lands was 36.8 percent of that of the example tract. The re-adjusted price of $5.36 on the example tract was further adjusted by this carrying capacity factor of 36.8 percent to the sum of $1.97 as applicable to the subject lands. The six Tierra Amarilla tracts were considered by Mr. Bowes to be equivalent in carrying capacity to the subject lands and no carrying capacity factor was applied to them. One other of the large tracts was adjusted by a carrying capacity factor of 36.8 percent, three were adjusted to 55.2 percent, and one to 64.5 percent.
Based on these analyses, Mr. Bowes arrived at an indicated value of $1.43 per acre, on the average, for subject lands in 1905, which indication was not expressed as an independent opinion of value but was correlated with value indications from all other sources in arriving at a final conclusion of value. By eliminating the sale with the highest price per acre and also the one with the lowest price per acre, Mr. Bowes by the same method arrived at a value indication of $1.38 per acre for subject lands. Mr. Bowes’ adjustments on the nine large sales, concerning which confirming witnesses testified, result in an average 1905 value indication for subject lands in the sum of $1.42 per acre.
68. Included among the 442 private transactions which Mr. Bowes took into consideration in arriving at his final opinion of value, were 210 private transactions involving sales of areas of grazing land in five counties bordering the subject area which sales were referred to by Bowes as his “small sales close.” According to Mr. Bowes’ information, these transactions involved a total of 114,290 acres, in 210 sales, for a total consideration of $331,114 (after deduc *54 tions for improvements, where present), or an average consideration of $2.90 per acre. The sales took place between the years 1882 and 1915, with the exception of two in 1916 and one in 1917. In location they ranged from immediately adjacent to portions of subject lands to a distance of 80 miles from subject area. The data considered by Mr. Bowes-included 109 sales in Wasatch County, 19 prior to 1906, and 90 in the years 1906 through 1915, involving 50,809 acres for a total consideration of $156,678, or an average of $3.11 per acre; 61 transactions in Duchesne County, all in the years 1910 through 1915, involving a total of 48,078 acres, for a total consideration of $101,531, or an average of $2.11 per acre; 10 transactions in Uintah County, all in the years 1907 through 1917, involving a total of 3,939 acres for a total consideration of $15,510, or an average of $3.94 per acre; and 30 transactions in Carbon and Sanpete Counties, 11 prior to 1906 and 19 in the years 1906 through 1916, involving 11,964 acres for a total consideration of $57,395, or an average of $4.80 per acre. The average size of all sales in this category, as taken into consideration by Mr. Bowes, was 544 acres.
69. The lands involved in these 210 private sales close to subject lands, considered by Mr. Bowes, were distributed in northeastern Utah, varying in elevations from 6,000 to-10,000 feet. All kinds of cover found upon subject lands were also found upon these 210 private sales, except that the private lands did not involve comparable stands of lodge-pole pine and had few barren and inaccessible areas. Subject lands were higher and had generally more precipitation and better water resources than the land involved in this category. Large areas of subject lands produced better forage and had better grazing resources, but considered as a whole, Mr. Bowes estimated that the private lands had a substantially higher average carrying capacity because of the inclusion of relatively less barren and inaccessible land.
In his analysis of the transactions in this category, Mr. Bowes concluded that no adjustment was warranted for the differences in size, on the basis of his opinion that the lack of assemblage value in the small private sales was sufficient to offset any dimunition of value attributable to the whole *55 sale size of subject area. In Bowes’ opinion no adjustment for time factor was warranted, inasmuch as Ms analysis of the sales prior to 1906 in this category showed a slightly higher average than the sales after that date. Of the 210 transactions, 30 occurred before 1906. To adjust for the greater accessibility and higher average carrying capacity of the private lands, Bowes applied the $2.90 average from the private lands to the 486,889 acres of subject lands best suited for grazing, which included 74,493 acres of grassland, 29,213 acres of sagebrush, 107,015 acres of mountain browse, and 276,168 acres of aspen and other woodland, as enumerated in finding 35. Mr. Bowes then added 50 cents per acre as an allowance for the 331,084 acres of coniferous timber land, and attributed no value to the 155,804 acres of barren and inaccessible land. The resulting value indication was $1.62 per acre. After Mr. Bowes’ appraisal report had been completed and submitted, Mr. Bowes discovered inaccuracies in some 13 of the 210 transactions, either contained in the information provided by an abstract company, or as revealed in the testimony of confirming witnesses. Correction of these inaccuracies resulted in a mathematical difference of one cent per acre in this indication of value, and Mr. Bowes testified that this change did not alter his final opinion of the value of subject lands.
Based upon Bowes’ estimate of an average carrying capacity of 3.3 acres per animal unit month, purchasers of these private lands paid an average of $9.81 per animal unit month of carrying capacity in their lands. Application of tMs data to the 181,000 animal unit months available on subject land gave Bowes an alternative indication of $1.80 per acre for the 1905 market value of subject lands. These indications were not used by Mr. Bowes as independent conclusions of value, but were correlated with indications derived from other sources of data in arriving at his final opinion of value.
70. Testimony of confirming witnesses was adduced by plaintiffs concerning 68 private sales, nearly all of which were included within Mr. Bowes’ 210 private sales close to subject lands. Of the 68 such transactions, six are eliminated from this finding because the testimony was -uncertain as to the consideration paid, leaving 62 sales, 44 of which were *56 in Wasatcb County, 14 in Duchesne County, 3 in Uintah County, and 1 in Sanpete County. The 62 sales aggregated 43,270.44 acres, or an average of 698 acres per sale, for a total .consideration of $121,547.16, or an average of $2.81 per acre.
Concerning the 44 sales in Wasatch County, 8 of which .are supported by deeds in evidence, these transactions occurred : 3 in 1900; 5 in 1905; 2 in 1907; 3 in 1910; 4 in 1911; 10 in 1912; 5 in 1913; 2 in 1914; and 10 in 1915. The total •acreage was 24,877.15, or an average of 565 acres per sale, for a total consideration of $75,540.86, or an average of $3.04 per acre.
Concerning the 14 sales in Duchesne County, 6 of which are supported by deeds in evidence, these transactions occurred during the years 1911 through 1915. The total acreage was 17,453.29, or an average of 1,247 acres per sale, for a total consideration of $42,866.30, or $2.46 per acre.
Concerning the three sales in Uintah County, all are supported by deeds in evidence and occurred during the years 1908,1915, and 1917. The total acreage was 780, or an average of 260 acres per sale, for a total consideration of $2,500, or $3.21 per acre.
The one sale in Sanpete County occurred in 1906, there being a supporting deed in evidence, and the acreage was 160 for a consideration of $640, or $4 per acre.
About two-thirds of the total acreage and most of the 44 sales in Wasatch County were located within the former Uintah Indian Reservation, in the areas adjacent to the eastern edges of the western part of subject lands, east of the Strawberry Valley withdrawal, and are closely comparable to the areas of subject lands which they adjoin, except that being at lower elevations they are less steep, receive less precipitation, have more sagebrush and pinon-juniper and less grassland and aspen woodland. The major streams ■arising in the western part of subject lands flow through this area. None of these private sales contains steep, rocky and inaccessible areas nor stands of thick coniferous timber. The remaining one-third of the total acreage of the 44 sales is located west of the divide marking the boundary of the western part of subject lands, and within a maximum distance of ten miles therefrom. These lands involved in the *57 sales on the western slope are comparable to the best lands of subject area, having aspen woods and grasslands with good water distribution.
The 14 sales in Duchesne County are entirely within the original Uintah Indian Eeservation, and were in the same general area and in some instances involved the same land purchased originally at the Uintah auction sales, hereinafter mentioned in these findings. They were at lower elevations than subject lands, without any substantial amount of steep and rocky areas and with less precipitation, having a carrying capacity less than the better areas of subject lands, but more than the average of the entire subject area.
The lands involved in the three sales in Uintah County are located 25 to 80 miles east of the north arm of subject lands, adjoining the eastern boundary of the Ashley National Forest. Lower in elevation, receiving less precipitation, predominantly covered by sagebrush and browse, these lands have less carrying capacity than the better areas but more than the average of subject lands.
The lands involved in the one sale in Sanpete County have a cover of aspen, grass and mountain browse, and are located adjacent to the Manti National Forest about 25 miles southwest of the south arm of subject lands.
71. Included among the 442 private sales known to Mr. Bowes and taken into consideration by him in arriving at his opinion of value, were 220 private transactions involving sales of relatively small areas of mountain grazing land in nine counties in Utah and western Colorado, considerably removed from subject lands. Mr. Bowes’ investigation disclosed 25 transactions in Eoutt County, Colorado, located 125 airline-miles east of the north arm of subject lands, involving 4,957 acres for a total consideration of $24,426, or an average of $4.93 per acre; eight transactions in Sevier County, Utah, located about 72 airline-miles southwest of the south arm of subject lands, involving 11,731 acres for a total consideration of $64,926, or an average of $5.53 per acre; 61 transactions in Mesa County, Colorado, located about 110 airline-miles southeast of the south arm of subject lands, involving 10,312 acres for a total consideration of $27,155, or an average of $2.63 per acre; 90 transactions in *58 the vicinity of the Uncompahgre Plateau in Montrose, Ouray, and San Miguel Counties, Colorado, located an average of about 174 airline-miles southeast of the south arm of subject lands, involving 19,084 acres for a total consideration of $71,062, or an average of $8.72 per acre; 30 transactions in Bio Blanco County, Colorado, located about 114 airline-miles east of the north arm of subject lands, involving 4,846 acres for a total consideration of $13,327 or $2.75 per acre; 5 transactions in Moffat County, Colorado, located about 50 airline-miles east of the north arm of subject lands, involving 920 acres for a total consideration of $2,700, or an average of $2.93 per acre; and one sale in Grand County, Utah, located about 48 airline-miles southeast of the south arm of subject lands, involving 5,492 acres for a total consideration of $23,560, or an average of $4.29 per acre. The total acreage of all sales as considered by Mr. Bowes in this category was 57,342, which sold for a total consideration of $227,156 (after allowances for improvements where applicable), or an average per-acre price of $3.96. The average size of all sales in this category was 261 acres. The sales took place between the years 1890 and 1915, with 29 prior to 1900, 83 during the years 1900 through 1906, and 108 after 1906. The average price for all sales prior to 1900 was $3.38 per acre; during the years 1900 through 1906, $2.99 per acre; and after 1906, $4.44 per acre.
72. The 220 private sales, substantially distant from subject lands, considered by Mr. Bowes, were located generally in areas bordering upon or near to national forests at elevations between 7,000 and 10,000 feet. The lands involved in these transactions, taken as a whole, were comparable in cover-type, forage, and topography, to large areas of subject lands and were characterized by grass, sagebrush, mountain browse, aspen and coniferous timber. However, the lands in the private sales had substantially less barren and inaccessible areas than the subject lands. The average carrying capacity of these private lands, largely because of their greater selectivity and accessibility, was estimated by Mr. Bowes as 3.09 acres per animal unit month.
Mr. Bowes concluded that the 486,889 acres of subject lands which were classified as grassland, sagebrush land, *59 mountain browse land and aspen land (see finding 35) were very similar to the lands involved in the 220 sales. However, he considered and concluded that the general economic environment with respect to population, road and rail development and other factors, was better with respect to this category of sales than as pertained to the subject lands. Accordingly, he reduced the $3.96 average price per acre of the 220 tracts by 20 percent to the sum of $3.17 to reflect a value of $1,543,438 for the 486,889 acres of the subject lands. He then added the sum of $165,542 representing value attributable at $0.50 per acre to the 331,084 acres of coniferous timber land on the subject lands. The resulting value indication for the subject lands was $1,708,980 or $1.75 per acre. In this analysis he attributed no value to the 155,804 acres of subject lands classified as barren or inaccessible.
Mr. Bowes’ judgment was that the carrying capacity of the lands in this category varied on the basis of the average for each of the counties from 2.5 to 4 acres per animal unit month with the total area of 57,342 acres having a total carrying capacity of 18,580 animal unit months. The total consideration paid in the sum of $227,156 indicated that a price of $12.22 was paid for each animal unit month of grazing, indicating that subject lands on the basis of a carrying capacity of 5.43 acres per animal unit month are only 57 percent as good for grazing purposes as the lands in this category of sales. Applying this 57 percent factor to the sum of $3.17 per acre (the price of the sales in this category adjusted downward by 20 percent to reflect the difference in economic environment) he concluded that an average per acre price for the entire subject lands was indicated in the sum of $1.80 per acre, or a total of $1,752,798.
These indications of value were not expressed by Mr. Bowes as independent conclusions of value, but were correlated with value indications derived from other sources of data in arriving at his final opinion of value.
73. Testimony of confirming witnesses was adduced by plaintiffs concerning 29 private sales, all included within Mr. Bowes’ 220 small private sales distant from subject lands. Of the 29 such transactions, two were eliminated from this finding because the testimony was uncertain as *60 to the consideration paid, leaving 27 sales, eight of which were in Sevier County, Utah; eight in Montrose County, Colorado; ten in Mesa County, Colorado; and one in Rio Blanco County, Colorado.
The 27 sales aggregated 12,469.33 acres, or an average of 462 acres per sale, for a total consideration of $63,514.66, or an average of $5.09 per acre. Eliminating the large sale among the Sevier County transactions, hereinafter mentioned, the remaining 26 sales aggregated 6,069.33 acres, or 233 acres per sale, for a total consideration of $19,514.56, or an average of $3.21 per acre.
Concerning the eight sales in Sevier County, Utah, one of which was supported by a deed in evidence, these sales occurred: one in 1907, and seven in 1913. The total acreage was 8,473.33, or an average of 1,059 acres per sale, for a total consideration of $52,294.56, or an average of $6.17 per acre. One large sale in this group consisted of 6,400 acres sold for $44,000 in 1907, or an average of $6.88 per acre,. The other seven sales in 1913 totaled 2,073.33 acres, or 298' acres per sale, for a total consideration of $8,294.56, or an average of $4 per acre.
Concerning the eight sales in Montrose County, Colorado,, all of which are supported by deeds in evidence, these transactions occurred: four in 1903, two in 1904, and two in 1905. The total acreage was 2,120, or an average of 265 acres per sale, for a total consideration of $5,570, or an average of $2.63 per acre.
Concerning the 10 sales in Mesa County, Colorado, nine of which are supported by deeds in evidence, these transactions occurred: one in 1905, one in 1907, five in 1912, and three in 1913. The total acreage was 1,716, or an average of 172 acres per sale, for a total consideration of $5,150, or an average of $3 per acre.
Concerning the one sale in Rio Blanco County, Colorado,, this transaction occurred in 1898, is supported by a deed in evidence, concerned 160 acres for a consideration of $500, or $3.13 per acre.
74. As a further basis for his final opinion of value, Mr. Bowes took into consideration the sales to private individuals by the Utah State Board of Land Commissioners of lands *61 owned by the State of Utah, as set forth in the records of proceedings and annual reports of the State Board. From the annual reports for 1900 (1901 not being available) and 1902 through 1915, pertinent excerpts from which are in evidence as plaintiffs’ exhibits 163 through 176, Mr. Bowes derived the following table concerning the sales of State lands to private individuals:

These lands were distributed throughout the State of Utah. Because they could be selected by purchasers, Mr. Bowes concluded that they constituted some of the best State lands available. He made an investigation of such sales in Wasatch, Duchesne, Carbon, Sanpete, Emery and Uintah Counties, all of which are adjacent or close to one of the major portions of subject lands, and plotted many of them on cover-type maps, and found that most of the areas so plotted had the same cover as found on subject lands. He concluded generally from his study and research that nearly all state lands in Utah suitable for dry-farming or irrigated farms had been transferred to private ownership prior to 1900.
The sales for 1900 through 1905 aggregated 1,139,721 acres for a total consideration of $1,686,764, or $1.48 per acre. Mr. Bowes concluded from his study that the State lands sold between 1900 and 1905 were inferior in forage and precipitation to subject lands, had a small portion of irrigable or dry-farming lands, but relatively little barren or *62 inaccessible areas. It was bis conclusion that the average quality of these State lands sold in 1900 and 1902 through 1905 was about equal to the average quality of subject lands,, provided that the 155,804 acres of rocky and rough lands in subject area's were eliminated. He then applied the $1.48 per acre (being the average paid for state lands from 1900 to 1905) to 817,973 acres of subject lands, indicating a value of $1,210,600 for all of subject lands, or $1.24 per acre, which was not expressed as an independent conclusion of value, but was correlated with value indications derived from all other sources in arriving at a final opinion of value.
75. Upon the admission of the State of Utah into the Union in 1896, the State received from the United States land grants totaling about 7.5 million acres. Some of the grants were of lands in place but in others the State was entitled to select lands from the public domain to satisfy unfulfilled allocations.
The lands of the State of Utah were administered by the State Board of Land Commissioners (now the State Land Board) under laws of the State of Utah. Lands were offered at public auction and any lands remaining unsold could be offered at private sale. The private sales were far more numerous and much greater in acreage covered. Prospective purchasers could select tracts of public domain and apply for the State to take them in satisfaction of unfulfilled allocations. In this manner the purchasers had the selection of the finest grazing lands either in State ownership or remaining a part of the public domain.
No more than 160 acres of State land could be sold to any one individual, except - that an individual could obtain a maximum of 320 acres of arid lands or four sections of grazing land. The applicant was required to make a deposit of $0.25 per acre, the balance being payable in 10 equal annual installments. Sometime prior to 1905, it appears that a minimum price of $1.50 per acre had been fixed by the State Board of Land Commissioners applicable to all lands disposed of by them. In 1905, the Board raised the price for selections from the public domain in satisfaction of unfulfilled allocations to $2.50 per acre, but the minimum price for other State lands was not then changed. Although the *63 specific date is not shown by the evidence, the minimum price for all lands was increased by 1910 to $2.50 per acre. Some few sales continued to be made at a lower price.
Sales of State lands declined from 1,102 certificates of sale issued in 1903 covering 240,690 acres at an average price of $1.44 per acre; to 869 certificates in 1904 covering 207,672 acres at an average price of $1.52 per acre; and to 174 certificates in 1905 covering 43,011 acres at an average price of $1.76 per acre. In its annual report covering 1905 the State Board of Land Commissioners stated as follows:
The year was characterized by a falling off in selections of lands in satisfaction of the grants to the State. The fact is due largely, if not entirely, to the withdrawal by the Secretary of the Interior of vast tracts as temporary forest reserves. These withdrawals were made prior to 1904, and while only a part of the land has been designated as permanent reserves, so far as private entries and selections by the State are concerned, the land is not a part of the public domain. The temporary and permanent reserves embrace much of the better part of the grazing lands of the State, including as they do, for the most part, the Wasatch range of mountains and incidental valleys and mesas. The applications for the purchase of lands by citizens are largely for grazing tracts, as very little agricultural land, easily and cheaply susceptible to irrigation, remains unoccupied in this State. While these so-called forest reserves maintain their present proportions, the State selections will necessarily be confined chiefly to lands brought into market by the extension of the public surveys. The Board has also increased the minimum price of lands selected to $2.50 per acre, and upon an application to select and purchase being received, it is at once referred to a member of the Board for investigation and reports as to the character and value of the lands applied for. There have been 33,211.14 acres applied for since this order was passed, and no application has been withdrawn on account of said raise, which will mean a gain to the State of $33,211.14, and ultimately of half a million dollars.
Sales of State lands were not classified according to the type of land involved. The 1900 report stated that buyers were mostly cattle-raisers, and sheep-growers. The 1904 report stated that new Government surveys of public lands, cover *64 ing some state lands, were generally of mountain lands valuable only for grazing. The reports for 1900,, and 1902 through 1915, show that 889,735 acres of State lands sold during those years in six counties adjacent to subject lands, that is, Wasatch, Summit, Uintah, Utah, Carbon and Sanpete ■Counties, for $1,753,698 or an average of $1.97 per acre.
According to the records of the State Board of Land Commissioners relating to cancellation of outstanding sales certificates, delinquencies in instalment payments resulted in cancellations reaching a high mark of 267 in 1904, with a decline to 148 in 1905, and thereafter further declines in later years.
From 1896 through 1912 the State Board of Land Commissioners sold 2,964,962 acres of State lands for $6,170,611, •or an average of $2.08 per acre, and by the end of 1915, additional lands bringing the totals to 3,291,421 acres for $7,112,-422, for an overall average of $2.16 per acre. In the years 1896 through 1904, 1,501,320 acres of State lands sold for $2,553,574, or an average of $1.70 per acre.
76. As a further basis for his final opinion of value, Mr. .Bowes took into consideration the Uintah auction sales of 1910 and 1912.
The Uintah auction sales were made in accordance with •the terms of the act of May 3,1905, which amended the act of May 27,1902. Pursuant to these acts, the unallotted and unreserved lands of the former Uintah Indian Beservation were opened to homesteaders for five years beginning August 28, 1905, the price being $1.25 an acre. It was further provided that all such lands not taken up within five years after the opening of the reservation should be sold for cash under rules to be prescribed by the Secretary of the Interior, no one person being allowed to purchase more than 640 acres of the reservation lands. Pursuant to this authority, substantial areas of unallotted, unreserved lands in the former Uintah Indian Beservation were sold at public auction in the years 1910 and 1912. These sales have been referred to as the “Uintah auction sales.”
The Uintah auction sales had been advertised and were well attended. Generally, the lands were offered in tracts of •320 acres each. Sales were for cash. Some purchasers were *65 able to acquire more than 640 acres by buying through members of their families or other agents.
The subject lands formed the rim of the basin within which the Uintah auction sales lands were located. The auction sales lands were enclosed on the west and south by the subject lands, but there was an Indian grazing reserve between these lands and the north arm. To the west and south, some of the auction sales lands joined the subject lands. They were in the same economic environment except that the auction sales were held five and seven years after the reservation had been opened to white settlement and at a time when prices had advanced materially.
Five years after the Uintah reservation had been opened to settlement, the 1910 sale was held at which 183,420 acres were sold for a total consideration of $250,503, or an average of $1.37 per acre. Prices ranged from a set minimum of $0.50 to $4.50 per acre. At the second auction sale held in 1912,136,441 acres sold for a total consideration of $206,662, or an average of $1.51 per acre. Prices on this sale ranged from the set minimum of $0.50 to $7.80 per acre.
At both these auction sales, 319,861 acres of land were sold for a total consideration of $457,165, or an average of $1.43 per acre. None of these lands contained stands of coniferous timber or large areas of rocky, rough land unsuitable for grazing, such as found within the subject lands. Mr. Bowes considered the general improvement in the economy between the years 1905 and the years 1910 and 1912, but concluded that better quality and higher rainfall of all the subject lands except that portion unsuitable for grazing, offset the improvement in general price level experienced during this period. Consequently he applied the average price of $1.43 per acre to the 486,889 acres of subject lands having covers of grass, sagebrush, mountain browse, and aspen and other woodland, for an indicated value of $696,-251 for that portion of subject lands. He then applied a value of $0.50 per acre to 331,084 acres of coniferous timberland of the subject area for $165,542, resulting in a total indication of value of subject lands in the sum of $861,793, or $0,885 per acre. This computation allowed no ascribed *66 value for tbe 155,804 acres of inaccessible or barren areas of tbe subject lands.
Mr. Bowes concluded from bis study and investigations tbat tbe carrying capacity of tbe lands sold at tbe 1910 and 1912 auctions was approximately 3.5 acres per animal unit month, and that the entire subject lands at 5.43 acres per animal unit month were only 64 percent as good in terms of grazing capacity. He applied this percentage to the $1.43 per acre price of tbe auctioned lands for an indication of value of $0.92 per acre for subject lands on a basis of relative carrying capacity.
In Mr. Bowes’ opinion, the value indicated for subject lands by tbe Uintah auction sales was from $0,885 to $0.92 per acre, or from $861,793 to $895,875.
77. Tbe Uintah auction sales lands were unimproved and generally at lower elevations than the subject lands. They received less precipitation but had a longer growing season. The cover types were mainly sagebrush and pinon-juniper, with relatively little of the more valuable types, aspen woodland, grassland and meadow, found extensively on subject .lands. Their terrain was much more level, and there were no substantial areas of coniferous timber, or barren or inaccessible lands. Water distribution for grazing purposes was in general better on subject lands, although several major streams originating in subj ect area flowed through the auction lands. The grazing capacity of the auction lands was less than the better areas but more than the general average of the subject lands.
78. As a further basis for his final opinion of value, Mr. Bowes took into consideration certain land sales by the Union Pacific Railroad to private individuals, which lands were located in Summit County, Utah. The source of his information was all Union Pacific deeds dated and recorded in that county in 1909, none of which was offered in evidence by plaintiffs. From his study of Union Pacific sales, he concluded that 1909 was the year when the greatest volume of such sales had occurred. These 1909 transactions, according to Bowes’ knowledge, involved 98,202.63 acres of land which sold for a total price of $74,890.14, or an average of $0.76 per acre.
*67 Summit County is adjacent on the north, to Wasatch and Duchesne Counties, and the area of Union Pacific sales in this county is separated from the northwest areas of subject lands by a forest reserve area varying in width from 7 to 15 miles. The western part of this area extends to within a few miles of Salt Lake City and Ogden, Utah, and the Union Pacific main line exists and has existed through the northern part of this area for many years prior to 1905. Elevations vary from about 5,000 to 10,000 feet. There are some areas that are steep, but generally the Summit County terrain in the areas involving Union Pacific sales is rolling, as compared to the higher elevations of the north arm of subject lands, and there are no large areas of barren or inaccessible lands. Precipitation on this area is comparable to the average of subject lands, with less than that obtaining in the highest elevations, but more than on the south arm of subject lands. The cover is primarily mountain browse and sagebrush with some aspen and other broadleaf woodlands at the higher elevations. There is some coniferous timber. The carrying capacity in 1905 was from 5 to 6 acres per animal unit month. The Union Pacific lands were alternate sections in each township, being the odd-numbered sections lying in checkerboard fashion in relationship to each other. All mineral and coal rights were reserved in the deeds by the Union Pacific Eailroad Company.
Mr. Bowes concluded that the subject lands had a higher per acre value as of 1905 than was indicated by the sales recorded in the 1909 Union Pacific deeds, for three reasons, as follows: (1) The Union Pacific lands are located at lower elevations and receive less annual precipitation than subject lands; (2) subject lands have an assemblage or plottage value because of their contiguity that is a value increment not present with respect to the Union Pacific sales; and (B) the rights being appraised on subject lands include all rights, surface and subsurface. He stated that his investigation showed that these railroad sales and sales made by other railroads at or near the year 1905, indicate that railroads were attempting to create good public relations with livestock operators by selling or leasing lands to them at bargain prices, and that railroads, in many instances, were badly in *68 need of funds to pay for railroad construction recently completed or in progress. He also observed that tbe Union Pacific sold and would sell its lands in no less tban complete sections, and he concluded that there was no selectivity in such sales. For the foregoing reasons, Mr. Bowes concluded that the value of subject lands would be from 20 to 25 percent higher than the value indicated by the sales recorded in the 1909 railroad deeds in Summit County, and that the value indicated for subject lands was from $0.91 to $0.95 per acre, or from $886,137 to $925,000.
79. The following table is a summary showing all of the categories of sales considered by Mr. Bowes and the values indicated to him for subject lands:

Mr. Bowes concluded that the large sales category was the most reliable because he believed the data therefrom was best confirmed, and because the large tracts were most comparable to subject lands in elevation and precipitation and in having all types of subject lands thereon. The small sales close were considered important by him because he considered that they had the same economic and locational factors, with the weakness being that the sales were small in size and further, that difficulty was encountered in attributing correct amounts to be deducted from prices for improvements existing on the land at the time of sale. He considered the small sales removed from subject lands to be important because they enlarged the base of comparable sales and because they were purchased by the same type of buyers who would be interested in subject area, with this category having the same weaknesses as the small sales close and the further dif *69 ficulty of being remote from subject lands. He concluded that the Utah State land sales showed a great demand for. lands in Utah at the date of valuation, and were further important in that it was certain that no improvements existed on them, with the depressing factor being limitation of the size of tracts that could be sold. He believed that the Utah State land sales were more indicative of the value of subject lands than the small sales distant but not as important as the small sales close. He considered the Union Pacific sales important because of certainty as to lack of improvements, but least reliable because they included surface rights only, and did not reflect the full fee value in the prices paid, and because it was difficult to ascertain the exact motive of the seller. He recognized the Uintah auction sales as reliable from the standpoints of proximity to subject lands and lack of improvements, but questioned whether the sales were conducted for the full benefit of the Indians to obtain maximum prices possible.
The average of all value indications reached by Mr. Bowes was $1.33 per acre, as shown above in the table in this finding. After according a reliability rating of 95 to the value indication of $1.41 per acre on the large tracts, 85 to the $1.71 indication on the small sales close, 75 to small sales distant, 80 to Utah State land sales, 70 to Union Pacific Railroad sales, and 80 to Uintah auction sales, Mr. Bowes reached an indication of value of $1.34 per acre for subject lands, or $1,304,861, which he rounded to $1,305,000 for his final opinion as to the market value of the 973,777 acres of subject lands on July 14,1905, after giving consideration to productivity of such lands and the rental-income indication of value.
80. As a still further basis for his opinion of value, Mr. Bowes gave consideration to the productivity of subject lands and the rental-income indication of value derived therefrom.
The actual income producing potential of subject lands had been demonstrated by July 14, 1905, and consequently would have influenced the market value of the lands as of that date. As set forth in finding 38, large tracts in the western end of the former Uintah Indian Reservation had been *70 leased to non-Indian livestock operators from time to time over the period from 1893 until 1905. After 1901, the area under these leases exceeded 800,000 acres. Substantial areas of subject lands were under these leases, including, at one time, all of the subject area west of the east fork of the Lake Fork and around to Indian Canyon. Portions of subject lands in the northeastern and southeastern areas were not included in any of these leases, but included were substantial areas of land in the former Indian Eeservation below the forest area. The rentals received varied from slightly over one cent per acre per season to a high of almost nine cents per acre per season. Rentals were rising and competition for the leases was spirited in the later years approaching 1905, as a consequence of which, a prospective purchaser of subject area in 1905 could have expected grazing rental income somewhat in excess of the actual rentals received up to that time. During approximately the same period, from 1896 to 1904, the State of Utah was receiving an average of approximately 5.36 cents per acre per year for the rental of state owned lands, largely grazing lands. Giving full consideration to all of these facts, a prospective purchaser of subject area in 1905 would reasonably have expected to have derived annual grazing rentals from subject property in an amount equivalent to 3 to 4 cents per acre, on the average.
Mr. Bowes concluded from his study of the leases involving the subject lands that 3 cents per acre per year was a reasonable rental value of subject lands as of July 14,1905. He next considered that between the years 1896 and 1904 the State of Utah rented some 524,626 acres of State lands at 5.36 cents per acre per year. He determined that these State lands were appraised by the State of Utah at $1.48 per acre or a total of $778,000. ' He noted that the appraised value of these State lands was approximately 28 times the annual rental received. He then applied this gross rental multiple of 28 to the 3 cents per acre per year rental value of subject lands to arrive at an indication of value for the subject lands of 84 cents per acre for grazing purposes only.
During the years 1906 through 1910, the Forest Service sold timber from the subject lands for which an average sum per year of $4,988 was paid. Mr, Bowes estimated from a *71 record in evidence as to the years 1914 and 1915 that the Forest Service permitted free use of timber in the years 1906 through 1910 at an annual average of $2,184. He then added the value of the free use timber to the price received on timber sales for an annual average for sales of timber in the amount of $7,172. He then multiplied the sum of $7,172 by the gross rental multiple of 28 to indicate an additional value of $200,816 for subject lands on account of receipts from timber, or 20.5 cents per acre.
He then added the timber value of 20.5 cents per acre to the grazing value of 84 cents per acre for a total indication of value for subject lands of $1.04 per acre or $1,012,728. Considering that all elements of market value were not necessarily reflected in the capitalization of rental income, Mr. Bowes used this approach largely as a method of testing conclusions from analyses of comparable sales, and concluded that the resulting value indication represented only a minimum value for grazing and timber uses alone.
As an alternative productivity approach, which Mr. Bowes believed tended to reflect all value elements, he computed the average price paid in the Uintah auction sales in 1910 and 1912 to be $7.48 per animal unit month. He then applied this sum of $7.43 to the 181,000 animal unit months of grazing available on subject area. The resulting indication for the market value of subject lands was $1.38 per acre.
81. Mr. Dean Mahaffey, presently an appraiser for the Federal Land Bank of Wichita, who had been Mr. Bowes’ principal assistant and consultant in the appraisal of subject lands, testified as to his own opinion of the value of the subject lands, based upon his independent analysis of the facts and data known to him both independently and as a result of his work with Mr. Bowes in this case.
Mr. Mahaffey was born and lived almost his entire life in western Colorado. He grew up on a livestock ranch where sheep ranching was the principal occupation of his family, and has since been continuously in contact with the ranching business in his family.
Mr. Mahaffey attended Mesa College in Grand Junction, Colorado, for one year, and graduated in 1931 with a Bachelor of Science degree from the Colorado Agricultural and *72 Mining College at Fort Collins, Colorado. Later he took a year of post graduate work in range management at the latter institution. He took a short post-graduate course in real estate appraising at Mesa College several years later. For a year and one half he was an instructor in agriculture at Mesa College in Grand Junction, Colorado.
Mr. Mahaffey had been employed by several United States government agencies on matters relative to range management, including the United States Forest Service, the Soil Conservation Service, and the Grazing Service. In the Soil Conservation Service he made range surveys and was given various assignments as a technical foreman in range management. He continued to make extensive range surveys of western lands after his transfer to the Grazing Service. During this latter employment, covering about three years, he conducted range surveys, classifying lands and making carrying capacity estimates, over approximately sy2 million acres in northwestern Colorado, doing both the field work and the mapping and compilation of the data derived therefrom. He was acquainted with and participated in the work of the govermnent inter-agency committee to standardize range survey procedures.
Mr. Mahaffey had been a licensed real estate salesman and real estate broker since 1948, and had been in the real estate business for himself for a period. In the course of this real estate business he dealt in farm, ranch, and range lands in western Colorado. He had been a ranch and farm livestock inspector for the United States Bank at Grand Junction, Colorado, in which capacity it was his duty to report upon the condition of many ranching operations for purposes of mortgages and loans. In the course of these duties he became acquainted with the market values of range lands in western Colorado. Mr. Mahaffey assisted in the appraisal of approximately 4*4 million acres of range land in Western Colorado in connection with the case before this Court entitled The Confederated Bands of Ute Indians v. United States, No. 45585. He was engaged in this project for approximately 18 months, largely devoted to range inspection, land classification, and preparing maps and mo *73 saics showing cover-types. He also assisted in the appraisal of approximately 270,000 acres of range land on the Sioux .Reservation on the Missouri River. Since completing his work, in connection with the appraisal of the subject lands in the instant case, Mr. Mahaffey has been employed as a land appraiser for the Federal Land Bank of Wichita. In that capacity it is his responsibility to appraise the land of applicants for loans. While the land is appraised on the basis of expected production over a period of years, in the course of Mr. Mahaffey’s duties he is required to take into consideration and to ascertain market value, to determine what the land has sold for in the last ten years, and to give his opinion as to what it would sell for presently.
Mr. Mahaffey participated with Mr. Bowes throughout most of the entire appraisal process as described in these findings and was familiar with substantially all of the facts and data taken into consideration by Mr. Bowes in formulating his opinion. Mr. Mahaffey participated in preliminary inspection of the lands to ascertain the nature of the problem. He did much of the work in collection of materials and documents pertinent to the appraisal problem, including Forest Service records, maps, mosaics, and land classification materials. He participated in a detailed surface inspection of the subject area, including coverage of all accessible areas by four-wheel-drive vehicle, and two aerial inspection trips. In addition Mr. Mahaffey spent many days on foot and horseback covering the more inaccessible portions of subject lands. In the course of this surface inspection Mr. Mahaffey participated in the analysis and confirmation of the land classification data and the carrying capacity estimate. Mr. Mahaffey personally conducted interviews with many elderly persons who had been upon the subject area in 1905 and read historical accounts to familiarize himself with conditions prevailing in 1905. He did much of the basic work in searching out, screening, and selecting comparable sales data in all of the categories included in the Bowes report. Under Mr. Bowes’ supervision he did the surface land classification and mapping for many of these comparable sales areas.
*74 82. Mr. Mahaffey was of the opinion that the market value of the subject lands as of July 14,1905, was $1,704,000, or an average of $1.75 per acre.
83. Dr. Franklin S. Harris, of Salt Lake City, Utah, testified in behalf of plaintiffs as to his opinion of the market value of subject lands.
Dr. Harris was reared on a cattle ranch in Mexico. He attended the Juarez Stake Academy in Mexico; received a Bachelor of Science degree from the Brigham Young University in Utah in 1907, and a Ph. D. from Cornell University in 1911. He also attended the Utah State Agricultural College and the University of Paris.
Dr. Harris began his professional career as an instructor in science at the Juarez Stake Academy in Mexico. Thereafter he was an assistant in agricultural chemistry at the Brigham Young University; assistant chemist at the Utah Agricultural Experiment Station; assistant in soil technology and instructor in that subject at Cornell University. In 1911 he became a professor of Agronomy at the Utah State Agricultural College and agronomist at the Utah Agricultural Experiment Station. In 1912 he became director of the School of Engineering at the Utah State Agricultural College and later the Director of the Agricultural Experiment Station for- the State of Utah. In 1921 he become president of the Brigham Young University, which position he held until 1945 when he became president of the Utah State Agricultural College. He was author of six books, five of them on agriculture, and a member of over thirty scientific societies.
Dr. Harris has served on several international assignments in the development of agriculture in various parts of the world, and in 1950 was appointed chairman of the United States mission which established the first “Point 4” program of this country in Iran. In 1940, he had been retained to supervise the organization of a forest service for the country of Iran, and range management was one of the items developed in this program.
As vice president of the Farmers and Merchants Bank at Provo, Utah, he has had experience in considering loan *75 applications, including livestock operations and grazing lands. He has been president of the Rural Rehabilitation Corporation of Utah, a Federal lending agency, in which capacity he supervised the business involved in loaning two million dollars to Utah farmers. In connection with family interests, he has had close association with the purchase and sale of grazing lands.
Dr. Harris had been employed to appraise approximately four and one-half million acres of grazing land in western-Colorado, just east of the -subject area, in connection with a case in this court entitled The Confederated Bands of Ute Indians v. The United States, No. 45585. He qualified as an expert appraiser and testified as to his opinion of the value of the land in that case.
Dr. Harris first became acquainted with the subject lands in 1904, when he was a member of the original survey party surveying a good deal of the subject area along its western and southern reaches. Since that time he has made recurring visits to the Uintah Basin, including several excursions into the subject area itself. He had occasion to go over portions of the subject lands in connection with the relocation of some elaterite mining claims. As director of the Utah Agricultural Experiment Station, he made frequent visits to the Uintah Basin in connection with a soil survey conducted jointly by the Experiment Station and the United States government.
Since being retained in this case, Dr. Harris made an automobile trip into and through the subject lands as far as and wherever existing roads would permit, and supplemented this survey by an inspection of the surface of subject lands from an airplane.
In addition to his personal acquaintance with subject lands, Dr. Harris familiarized himself with the specific sales data on comparable sales and information concerning subject lands involved in the Bowes report and the testimony and exhibits in evidence in this case.
84. Dr. Harris was of the opinion that the market value of the 973,777 acres of subject lands as of July 14,1905, was $2,011,389, or $2,065 per acre.
*76 Dr. Harris gave his opinion as to the relative values of the various types of land in subject area according to cover-type ■classifications, as follows:

85. Mr. Werner Kiepe, a resident of Salt Lake City since 1907, testified in behalf of the defendant as to his opinion ■of the market value of subject lands.
Mr. Kiepe received a Bachelor of Science degree from the University of Utah in 1926, majoring in economics, thereafter taking a number of postgraduate courses in statistics and economics. He completed courses in real estate appraising given jointly by the American Institute of Eeal Estate Appraisers and the University of Chicago in 1935. Mr. Kiepe had conducted courses in appraisals for the local chapter of American Bankers, for the Salt Lake Eeal Estate Board and for the Salt Lake City Board of Education, and has lectured at the University of Utah on economics and real estate.
Since 1937 he has been an active member of the American Institute of Eeal Estate Appraisers, and in 1951 he was president of the Eocky Mountain Chapter of that organi-sation. He was a member and had been president of the Utah Chapter of the Society of Eesidential Appraisers and was a member of the Utah State Eealty Association.
Mr. Kiepe was employed in 1926 as secretary of the Salt Lake Eeal Estate Board. He has been making appraisals independently of that Board since 1928 although he continued as an official until 1912 when he was president. In .1937 he took a position with the Union Bank and Trust Company in which position he made appraisals for the company but also extended his private appraisal practice. In 1942 he was granted leave to engage in appraisal work for the Army Engineers, where he was employed as Chief Eeview- *77 ing Appraiser of the Rocky Mountain Division of the United States Engineers and later as Chief Reviewing Appraiser for the Salt Lake Office of that organization. This included the making and reviewing of appraisals of real estate in the States of Utah, Nevada, Colorado, Idaho and part of Montana. In 1943 Mr. Kiepe formed his present partnership. His principal clients included a number of large insurance-companies, banks, oil companies, state, county and city municipal governments, and agencies of the United States.
Mr. Kiepe had made no prior appraisals in the Uintah basin but his firm had handled properties in that area which had been offered for sale. His appraisal experience, particularly with the Army Engineers, had covered large areas of both summer and winter range land in the State of Utah. This included those acquired for Army installations in Salt Lake County, in and around Park City in Summit County, and one appraisal covering an area in the Wasatch range approximately 25 miles long by 15 or 20 miles in width. Other appraisals made and reviewed by him included tráete of many thousands of acres each of range lands in the State of Utah.
Mr. Kiepe has previously qualified as a valuation expert in the courts of the State of Utah and several of the U. S. District Courts. He has made several appraisals for private clients in tax cases before the Internal Revenue Service in which it was necessary at a recent date to establish the market value of property as of March 15, 1913.
86. In his appraisal of the subject lands, Mr. Kiepe used the market data or comparable sales approach, and also the capitalization approach. The location and extent of subject lands were correctly determined by Mr. Kiepe, and his appraisal covers the 973,777 acres described in these findings. He assumed for the purpose of his appraisal that the subject lands would be sold in one unit and that the purchaser would receive a fee simple title free from any adverse claims.
Before doing field inspection work, Mr. Kiepe employed a number of professional men in various fields to assist him in obtaining as complete data as possible concerning conditions at the date of the appraisal. He employed two historians to do historical research, a geologist, an expert in *78 range management, a forestry expert and an engineer acquainted with water matters in the Uintah basin. Mr. Kiepe, with the assistance of these experts, did research in the libraries of the States of Utah, Wyoming, and Colorado, and at Berkeley, California, as well as in state and federal offices having records pertaining to the subject lands. Information was assembled disclosing conditions on the subject area in 1905 and maps and other descriptive data to aid in field research were collected.
Prior to undertaking this appraisal, Mr. Kiepe had knowledge of the subject lands and their environment derived from his long residence and professional experience in the State of Utah, trips into the subject lands for recreational purposes, and from the small amount of real estate business carried on in the basin by his firm.
Upon completion of his preliminary research, Mr. Kiepe made an inspection of the subject area. This was done in the summer months since much of the area is inaccessible during the late fall, winter and early spring. Commencing in July 1952, he spent a week examining the subject lands with Dr. Lawrence A. Stoddart, in a four-wheel drive vehicle. In many instances, they saw the range before the stock had grazed over it. This was followed by a trip with a soil expert. Mr. Kiepe spent ten days on the subject area with Professor J. Whitney Floyd, his forestry adviser, giving special attention to the forested areas. During this time they took horseback trips into the inaccessible areas along the Uintah range on the north arm. The inspections with Professor Floyd were chiefly after the stock had grazed the area, and thus Mr. Kiepe had examined the range both before and after it was grazed. Mr. Kiepe made additional trips into the subject lands and interviewed many of the old-time residents who had lived or grazed stock in the vicinity in earlier years.
87. The defendant offered the testimony of Dr. Lawrence A. Stoddart to establish the condition of the forage on the subject lands in 1905 as compared to 1951, and to establish the grazing capacity of the range in 1905. He was head of the Department of Range Management of Utah State Agricultural College and was ecologist with the Utah State Ex *79 periment Station. He had been so employed since 1935, with the exception of one year. He has made studies of competition for forage between wildlife and domestic livestock. For several years Dr. Stoddart had charge of the analysis of range lands by counties over the entire State. In connection with this work a study was made of the entire Uintah basin, including all of Wasatch, Duchesne and Uintah Counties, by the Experiment Station of the Utah State Agricultural College in cooperation with agencies of the Departments of Agriculture and Interior. Dr. Stoddart had supervised and directed extensive range surveys in Wasatch and Duchesne Counties. The results of the range surveys were published in map form and a report of the survey was published in a pamphlet entitled “Range Conditions in the Uintah Basin.”
Dr. Stoddart was employed by Mr. Kiepe to furnish him advice on range conditions and grazing capacity of the subject lands in 1905. During the summer of 1952, Dr. Stod-dart spent a full week on the subject area with Mr. Kiepe, making an examination of range conditions.
Dr. Stoddart also examined various historical reports and concluded that they were conflicting and difficult to interpret. He further concluded from his study that Forest Service supervision of grazing on the subject lands had resulted in improvements in the range and that conditions in 1905 were not as good as they were in 1951.
Dr. Stoddart reviewed the data and original maps of the Uintah basin survey made under his supervision about 1935, which were in his office, but not offered in evidence in this case. He perimetered each range type within the subject area and after analyzing the data concluded that the subject lands had a carrying capacity of 133,700 animal unit months, having taken into consideration forage consumption by deer. Dr. Stoddart did not consider this figure reliable.
The actual stocking of the range on subject lands in 1951, as shown by Forest Service records, was 83,661 animal unit months, exclusive of wild life. This actual use was only 79.8 percent of the use permitted by the Forest Service.
Dr. Stoddart testified that statistics showing forage consumption on the subject lands by wildlife in 1905 were not available, but that it was probable that wildlife had increased *80 substantially by 1951. -He estimated that forage consumption by wildlife, which would otherwise have been available for domestic livestock, amounted to 20,450 animal unit months. By adding this figure to the 83,661 animal unit months of actual use by domestic livestock, Dr. Stoddart concluded that 104,111 animal unit months of forage were actually consumed on the subject lands in 1951.
Dr. Stoddart considered that livestock operators would probably stock the range heavier than professional range people. The technical concept of proper range use was considerably different in 1905 than in 1951. The grazing by domestic livestock in 1951 was lower than the preceding years, due to Forest Service conservatism which became the established policy, commencing in 1920 after excessive use of subject lands in World War I. The Forest Service had the further policy that national forests should serve recreational and watershed purposes as well as grazing. Taking all of these factors into consideration, Dr. Stoddart concluded that in 1905 a prospective purchaser of the subject lands considered to be well informed under then existing conditions would have felt that the subject lands had a higher grazing capacity than the actual forage consumption experienced in 1951.
Dr. Stoddart allowed a 20 percent increase on the figure of 104,111 animal unit months, and concluded that the grazing capacity in 1905 as measured by modern range management methods and 1951 figures as to stocking, was 124,933 animal unit months. Mr. Kiepe reviewed the consideration and study of Dr. Stoddart and arrived at the same conclusion, finding that subject lands had a carrying capacity in 1905 of 125,000 animal unit months, or 7.79 acres per animal unit month. For comparable sales purposes, Mr. Kiepe dropped the fraction and used a carrying capacity of seven acres per animal unit month.
88. Mr. Kiepe considered comparable sales data the most reliable indication of market value of the subject lands on July 14, 1905. In selecting comparable sales, he considered that similarity of use and similarity in size were important factors; he considered that sales made nearest the time of the appraisal were preferable to those made at more remote *81 times; and be considered that sales of lands nearby the subject property which would reflect local conditions were preferable to sales of lands farther removed.
Mr. Kiepe obtained compilations of land sales made at about the time of the subject appraisal which were recorded in Uintah, Duchesne, Wasatch and Summit Counties, Utah; Uinta and Sweetwater Counties in Wyoming; and Moffat County in Colorado. Efforts were then made to confirm the private sales by contacting the parties to them. He concluded that satisfactory confirmation of private sales made about 1905 could not be obtained because the parties had removed from the area, were deceased, or because their recollection was not clear due to old age and the length of time which had elapsed. He further concluded that the private sales did not furnish information on the value of the subject lands as of July 14, 1905, as reliable as other categories of sales.
Mr. Kiepe found six groups of sales which he considered offered reliable evidence of the market value of the subject lands as of the evaluation date: (1) Uintah auction sales; (2) sales of State lands by the State Land Board; (8) sales by the Union Pacific Railroad in Summit County, Utah; (4) sales by the Union Pacific Railroad in Morgan County, Utah; (5) sales by the Union Pacific Railroad in Uinta County, Wyoming; (6) sales by the Central Pacific Railroad in Box Elder County, Utah.
89. As a result of his study and consideration of the Uintah auction sales of 1910 and 1912, Mr. Kiepe was informed as to the general facts concerning these sales as related in finding 76.
A special study of that part of the Uintah auction sales lands lying in Ranges 5, 6,7,8,9, and 10 West, being roughly those lands lying west of the Town of Duchesne, was made by Mr. Kiepe based upon the records of the Bureau of Land Management. It comprised the western end of the reservation lands inside the subject lands. The eastern portion of the reservation was omitted from this study because many of the lands there were considered by Mr. Kiepe to be suitable for agriculture and irrigation and were less comparable to the subject lands.
*82 Mr. Kiepe concluded that the lands in this special study area had a grazing capacity of 6 acres per animal unit month.
Approximately 53 percent of the 183,420 acres of land sold at the 1910 sale were in Mr. Kiepe’s special study area. An analysis of the sales in the special study area, based upon the Bureau of Land Management records, disclosed that of the 390,829.04 acres in this area offered for sale in 1910, 467 sales were made covering a total of 96,559.37 acres for a total consideration of $139,971.45 or an average price per acre of $1.45.
Approximately 80 percent of the 136,441 acres of land sold at the 1912 Uintah auction sale was in this special study area. Of the 164,806.31 acres in this area offered for sale in 1912, 509 sales were made covering a total of 132,878.24 acres for a total consideration of $244,652.47 or an average price per acre of $1.84.
Three adjustments were made by Mr. Kiepe to the average prices of $1.45 per acre for the 1910 sales, and $1.84 per acre for the 1912 sales in his special study area.
The first adjustment concerned the element of the difference in time from the valuation year of 1905. From publications of the United States departments concerning national price indices, Mr. Kiepe compiled a table showing the general price index and also indices for prices of farm products, cattle per head, sheep per head, beef per cwt., and lamb per cwt. for each year 1895 through 1914, and for each year computed an average of all such indices, adjusted with the year 1900 at a base of 100. He then converted this average of all indices for each year into a 3-year moving average. For example, for the moving average for 1905, he took the average of the average indices for 1904, 1905, and 1906, and the moving average for each year was computed in the same manner. The moving averages for the years 1910 and 1912 were respectively Í22.6 and 130.9, with the moving average for 1905 at 101.8. Stating that he used the pertinent moving averages, Mr. Kiepe reduced the 1910 price per acre of $1.45 by 27 percent, and the 1912 price of $1.84 per acre, by 37 percent.
The second adjustment pertained to sizes of the tracts sold at the 1910 and 1912 auctions as contrasted with the entire *83 area of subject lands. He considered that competition for such a large tract would be less and that the market price would be less per acre than on the small tracts. Accordingly, he reduced the 1910 per acre price of $1.45, and the 1912 per acre price of $1.84, each by 5 percent.
The third adjustment concerned relative carrying capacities, based on his conclusions of 7 acres per animal unit month for subject lands, and 6 acres per animal unit month for the 1910 lands, and 5.5 acres for the 1912 lands sold in his special study area. Mr. Kiepe allowed for this purpose a 14 percent adjustment on the 1910 price, and a 13 percent adjustment on the 1912 price.
Accordingly, Mr. Kiepe reduced the 1910 price of $1.45 by 46 percent, the total of adjustments, to reach a 1905 price for the subject lands of $0.78 per acre. He reduced the 1912 price of $1.84 by 55 percent, the total of adjustments, to reach a 1905 price for subject lands of $0.83 per acre.
90. From his research and study, Mr. Kiepe was informed as to the sales of Utah State lands by the State Board of Land Commissioners substantially in accordance with the facts related in finding 75.
Because the reports of the State Board did not classify sales as to types of land sold, Mr. Kiepe did not consider sales over the entire State sufficiently reliable as comparable sales data, and he selected a special study area comprising townships 1 and 2 north, range 7 east, in Summit County, with which he was familiar. These two townships are approximately 12 miles northwest of the northwestern extremes of subject lands and lie in the upper drainages of the Weber Liver and Chalk Creek. The State lands were located in alternate sections, as the odd-numbered sections lying in checkerboard fashion belonged to the Union Pacific Eailroad Company.
The special study area of the State land sales consists of unimproved lands on the north slope of the western end of the Uintah mountains and east of the Wasatch range. The north slopes in this area are not as rugged as the south slopes in the north arm of subject lands. They are not so directly exposed to the sun and hold moisture better. As a result, they provide a better type of forage than the north arm, but *84 not as good as the western portion of subject lands. Elevations range from about 6,500 feet along, the creeks to about 10,000 feet. The forage types are comparable with the forage on the better lands in the subject area with sage-brush, browse, aspen, and a negligible amount of coniferous timber. The entire area can be grazed.
Mr. Kiepe concluded that because substantial quantities of State lands remained unsold statewide in 1905, and because purchasers could select lands in areas as small as 16C acres, with some few selections covering as little as 40 acres within any one section, it would follow that the lands which had been sold were the choice parcels. Considering the high selectivity enjoyed by the purchaser and the quality of the forage, Mr. Kiepe decided that these special study State lands in Summit County had a carrying capacity of 4 acres per animal unit month.
In the special study area, 27 sales had been made during the years 1900 through 1904 covering 10,592 acres, for a total consideration of $15,738 or $1.49 per acre. No sales were made in the area in 1905 or 1906. The certificates of sale are in evidence and show the consideration and the dates on which each of the ten deferred payments was due, including both principal and interest.
Two adjustments were made by Mr. Kiepe to correlate these State land sales to the value of subject lands as of July 14, 1905. Mr. Kiepe made a downward adjustment of 41 percent for quality of the range based upon his judgment as to the difference in carrying capacity. A further downward adjustment of 10 percent was made because of the advantage that he considered the State lands had due to the payments being deferred over a period of 10 years, which he believed would have increased the number of potential buyers and the competition for the lands. The adjustments downward total 51 percent which Mr. Kiepe applied to the existing State Board’s minimum price of $1.50, which corresponded with the average per acre price of the lands sold during the years 1900 through 1904 in his special study area of Summit County. He concluded that based solely upon the State land sales in the special area, *85 a value of approximately $0.74 per acre was indicated for the subject lands in 1905.
91. Mr. Kiepe considered four classes of sales by railroads of the lands granted to them by the United States to aid in the construction of their roads. The Union Pacific Kailroad and the Central Pacific Kailroad each received grants of the odd-numbered sections for 20 miles on each side of its right-of-way. These railroads thus had millions of acres of lands which they could sell to raise capital.
Mr. Kiepe’s investigation of the circumstances under which the railroad sales were made included examination of the railroad records and interviews with officials of the Central Pacific Railroad (now the Southern Pacific) in San Francisco, California, and of the Union Pacific in Omaha, Nebraska. He found that each had entered upon a very active real estate sales campaign to dispose of its lands to raise capital. He concluded that through years of experience in selling large areas of western lands of all types, the railroads were unusually well qualified as well-informed sellers, and that these railroads followed a consistent policy of stating the true and complete consideration in their deeds of conveyance.
The railroad sales considered by Mr. Kiepe were of unimproved grazing lands located in alternate sections lying in checkerboard fashion in Utah in Summit, Morgan, and Box Elder Counties, and in Wyoming in Uinta County. The deeds covering these sales are in evidence. Sales were made at the approximate time of and for several years preceding the date of valuation of subject lands. The Union Pacific deeds show that the sales were made on terms, the purchaser paying 10 percent down and the balance over a period of 10 years, with interest at the rate of 6 percent per annum, with all coal and other minerals within or underlying the lands reserved to the Union Pacific Kailroad Company. The Union Pacific deeds were not executed until all deferred payments were made, but each deed showed the date of the original sales contract. Mr. Kiepe concluded from his investigation that neither of the railroads offered purchasers a choice of small tracts but required the purchaser to take all land owned by the railroad within a given section and *86 sometimes grouped the sections in a larger package to assure disposal of less desirable tracts.
92. Mr. Marcellus Palmer was employed by Mr. Kiepe and testified for the defendant with respect to the comparability of the railroad sales in the four counties. Mr. Palmer was a professional range management consultant. He was reared on livestock ranches and spent his boyhood on a ranch in the railroad area in Box Elder County. He also spent six! years on a ranch in Idaho. He continued on livestock ranches until he was 25 years of age, when he entered the School of Forestry of Utah State Agricultural College, receiving a Bachelor of Science degree in 1940, with his major study in range management.
Mr. Palmer spent the 1989 summer season with the Department of Agriculture, making range analyses in Box Elder County. This work took him on to all the major livestock ranches and several of the smaller ones in the county for the purpose of making forage analyses to be used in advising the stockmen on ranch operations and conservation practices. After graduation in 1940, Mr. Palmer returned to the Department of Agriculture and had charge of the range analy-ses work in the five counties in northern Utah doing the same type of work as in the 1939 season. In October 1942, Mr. Palmer was moved to the State headquarters office of the same agency and with another technician had charge of the range conservation program for the entire State of Utah. He worked directly with the livestock men making range analyses which were the basis for range improvements. He remained in this position until October 1946, and during this time became further acquainted with all the railroad sales lands through the range examinations made by him.
In October 1946, Mr. Palmer left the Department of Agriculture and entered into private practice as a range management consultant, a rather new profession. He furnishes technical assistance and advice to landowners and livestock operators concerning the carrying capacity of their ranches, changes in operations which would return a greater profit, and conservation and range management practices. He is a licensed real estate broker in the State of Utah, and furnishes advice and assistance in obtaining and retaining range per *87 mits on federal lands. Some of bis principal clients are among the largest livestock operators in the State of Utah. His practice covers the State of Utah and all adjoining states, except Arizona. Mr. Palmer is secretary and adviser for five livestock associations and a member of the American Society of Range Management. Since 1948 he had been resident land agent for the Southern Pacific Railroad, assisting it in disposing of the residue of its lands.
Mr. Palmer has many clients in the area covered by the Union Pacific and Central Pacific sales. He has also had considerable experience in the Uintah basin. Some of his clients have Forest Service permits covering portions of the subject lands and he has been over the subject lands except the high areas of the Uintah mountains.
Mr. Palmer prepared the maps in evidence which show the State sales in Summit County, the Union Pacific Railroad sales in Summit and Morgan Counties, Utah, and Uinta County, Wyoming, and the Central Pacific Railroad sales in Box Elder County, Utah.
93. Mr. Kiepe’s information with respect to the Union Pacific sales land located in Summit County, Utah, was substantially in accord with the facts set forth in the second paragraph of finding 78, except that he considered the soils to be deeper and the forage to be better on the Summit County lands than on the average of subject lands, and that .moisture retention was also better on these north slopes. He concluded that these Union Pacific sales lands in Summit County had a carrying capacity of 6 acres per animal unit month. He accorded a higher carrying capacity to his special study area of sales of State lands, located in this same county, because of what he considered to be higher selectivity enjoyed by purchasers of State lands.
94. On the basis of the deeds in evidence, Mr. Kiepe analyzed 124 sales made by the Union Pacific Railroad in Summit County during the years 1895 to 1907. He divided the sales into groups of one section or less and of one section or more. There were 16 sales of less than one section covering 4,906.47 acres for a total consideration of $7,489.29, or an average of $1.53 per acre. There were 108 sales of one section or more covering 262,220.77 acres for a total considera *88 tion of $232,508.73 or an average of 89 cents per acre. For Ms correlation with the subject lands, Mr. Kiepe used only the sales of one section or more. Mr. Kiepe concluded that the division between large and small tracts demonstrates that sales of small tracts compel substantially higher prices. Experienced livestock men testified in this case that they would have paid more per acre for a large area of contiguous sections of range land than for smaller pieces which had to be assembled in a usable unit. The evidence tends to demonstrate that the smaller sales of railroad lands in Summit County had a greater price per acre because of peculiar locational factors.
Two adjustments were made by Mr. Kiepe to relate the $0.89 average price per acre on the 108 sales of one section or more, to the value of subject lands as of July 14, 1905. The first adjustment by 10 percent was made because the railroad lands could be bought on a time payment plan extending over 10 years, whereas it was assumed that subject lands would be sold for cash. The second adjustment by 13 percent was made on the basis of Mr. Kiepe’s conclusion that subject lands had a carrying capacity of 7 acres per animal unit month as compared with six for these sales. Mr. Kiepe applied a total downward adjustment of 23 percent to the price of $0.89 for an indication of value on subject lands of $0.69 per acre in 1905.
95. The Union Pacific Railroad sales in Morgan County lie northwest of Summit County, the nearest being about 35 miles northwest of the northwestern portion of subject lands. The lands surround the Town of Morgan, which is on the Union Pacific Railroad and was an established community in 1905. The economic development of Morgan County in 1905 was considerably ahead of the subject area.
The Morgan County lands are on the east slope of the Wasatch Mountains and are cut by the Weber River canyon, part of which has a south slope. The Union Pacific Railroad travels through this canyon. There are some steep areas along the canyon which are inaccessible. North and eastward higher elevations are found which provide desirable summer grazing. Elevations extend to about 10,000 feet.
The lower area on the south slope has an annual type of *89 vegetation, largely cheet grass. There is some sage brush and higher up there is mountain browse and aspen with grasses and forbs. Precipitation is less than on the subject lands.
Mr. Kiepe was of the opinion that the Morgan County lands were very comparable in grazing capacity to the subject lands and that their carrying capacity was seven acres per animal unit month. Mr. Palmer, defendant’s professional range management consultant, had been acquainted with the land since 1942 through his work with the Department of Agriculture and through services performed for the livestock operators. He had discussed the condition of the range with people acquainted with its use prior to that time and had observed the effect on the range of 70 years of livestock grazing. He was of the opinion that the Morgan County lands, particularly on the lower slopes, had deteriorated somewhat and that the grazing capacity on the lower slopes was less than in 1905. The capacity on the higher slopes remained about the same. In his opinion the carrying capacity was 6 acres per animal unit month in 1952 and 514 acres per animal unit month in 1905. The evidence establishes a carrying capacity of from 6 to 7 acres per animal unit month in 1905, and Mr. Kiepe used seven acres in making his correlation.
96. On the basis of the deeds in evidence, Mr. Kiepe analyzed 64 Union Pacific Railroad sales in Morgan County made between 1895 and 1908. Seven of these sales included lands in both Morgan County and Summit County and to that extent Mr. Kiepe considered the same sales twice. He divided the sales into groups of sales covering less than one section and covering one section or more each. There were 16 sales of less than one section covering 6,273.14 acres for a total consideration of $9,165.19 or an average of $1.46 per acre, and 48 sales of one section or more each covering 197,742.97 acres for a total consideration of $151,184.79 or an average of $0.76 per acre. For his correlation of these sales with the subject lands, Mr. Kiepe used only the sales of one section or more.
Mr. Kiepe considered that only one adjustment, which concerned the time payment plan, was required to relate *90 the average price of $0.76 per acre on the Unión Pacific sales of one section or more in Morgan County, Utah, to the value of subject lands as of July 14, 1905. Accordingly, he reduced the $0.76 price per acre by 10 percent to indicate a value of $0.68 per acre for the subject lands as of 1905.
97. The Union Pacific Eailroad sales in Uinta County, Wyoming, are directly north of the north arm of the subject lands, at the closest point, a distance of about 15 miles. Uinta County is located in the southwest comer of the State of Wyoming across the state border from Summit County.
The Union Pacific Eailroad sales in Uinta County, Wyoming, were essentially the same as the Uinta Development Company lands, hereinafter mentioned in finding 99. They were located mostly on a plateau area at elevations between about 5,500 to 6,000 feet, with some limited areas adjacent to the Utah line reaching elevations between 6,000 and 8,000 feet. Precipitation on these lands averaged 8 to 11 inches per year, considerably less than on subject lands, and water distribution was so limited that they were suitable in the main only for winter grazing, with light snowfall usually experienced. Some spring and fall grazing occurred on the fringes adjacent to the Utah line. The lands were characterized by the forage of semi-arid lands, with large areas of sagebrush and sparse feed for livestock. The carrying capacity of these lands was considerably less than the average of subject lands. However purchasers expected to obtain the free use of intervening even sections of the public domain, but were required to find summer grazing lands elsewhere.
Mr. Kiepe characterized this Wyoming area as “a little less mountainous” with a “rolling” terrain with “streams which rise in the Uintah Mountains” flowing through- “this particular county wending their way up to the Bear Eiver and the Green Eiver.” He described the south area of the county as “grassland,” with “many of its areas” having some “very excellent ranches.” He further stated that farther north, these lands were “definitely more winter range,” with the southernmost extremities used for summer range. His information on precipitation was that this area experienced *91 10 to 15 inches per year, and he stated that it was watered by streams which flow the year around.
Mr. Palmer had been acquainted with the Uinta County, Wyoming, lands since 1942, and had talked with livestock men who had used the lands for a period of years. In his opinion there had been a slight deterioration of the available forage since 1905, particularly adjacent to the ranches, and that this had resulted in a drop in carrying capacity for these lands from 6y2 acres per animal unit month in 1905 to 8 acres in 1952. Mr. Kiepe was of the opinion that in 1905 the lands had a carrying capacity of less than 8 acres per animal unit month but that this was a reasonable figure because of the additional forage the purchasers expected to obtain from the adjoining public domain. The Uinta Development Company lands in Uinta and two adjoining counties are now being grazed at the rate of only slightly more than 8 acres per animal unit month, whereas the 1907 actual use was about 10.67 acres per animal unit month.
98. On the basis of the deeds in evidence, Mr. Kiepe analyzed 58 Union Pacific Bailroad sales in Uinta County, Wyoming. He divided the sales into groups of sales covering less than one section and covering one section or more each. There were 17 sales of less than one section covering 4,722.27 acres for a total consideration of $6,438.50, or an average of $1.36 per acre, and 41 sales of one section or more covering 105,699.28 acres for a total consideration of $77,-640.37 or an average price of 73 cents per acre. For his correlation of these sales to the subject lands Mr. Kiepe used only sales of one section or more.
Two adjustments were made by Mr. Kiepe to relate the $0.73 average price per acre on the 41 sales of one section or more, to the value of subject lands as of July 14, 1905. The first adjustment by 10 percent concerned the time payment plan. The second adjustment by 14 percent was made in favor of the subject lands on the basis of Mr. Kiepe’s conclusions that subject lands had a carrying capacity of 7 acres per animal unit month as compared with 8 for these sales. Mr. Kiepe applied a net adjustment upward of 4 percent to the $0.73 average price per acre for an indication of value of $0.76 per acre on subject lands in 1905.
*92 99. The testimony of one of the incorporators and principal owners of the Uinta Development Company was adduced by plaintiffs concerning the purchase by that company of large acreages of Uinta County, Wyoming, lands from the original purchasers from the Union Pacific Railroad Company. Between 1908 and 1910, these original purchasers assigned their Union Pacific sales contracts to Uinta Development Company to permit consolidation of their land holdings for a more advantageous use of the land. Purchase contracts covering approximately 400,000 acres were thus sold and assigned to that company, with the purchase price ranging from $0.90 to $1.25 per acre.
100. The Central Pacific Railroad sales in Box Elder County, Utah, lie at their nearest point about 100 miles northwest of the northwest boundaries of subject lands. West of these lands are the Raft River Mountains, located in the northwest part of the county. In these mountains is located the Minidoka National Forest. South of these mountains and west of the railroad sales area is located a saline desert. East of the railroad sales area, the Bear River valley extends in a north and south direction, and in this valley are located irrigated farm areas situated about the towns of Brigham City, Bear River City, and Corinne, which were established some years prior to 1905. This railroad sales area extends from the Great Salt Lake on the south, to the Idaho State line on the north. The sales considered by Mr. Kiepe do not involve the irrigated farmlands on the east, the Raft River Mountains and saline deserts on the west, and the saline lands on the north shores of the Great Salt Lake.
The average annual precipitation in this area for the years 1898 through 1932, according to a record of the United States Department of Agriculture in evidence, was 10 to 15 inches for areas along the eastern and northern portions of this sales area, and 5 to 10 inches in the central, southern and southwestern portions. The terrain is gently rolling mountains with extensive areas of relatively level valleys. The elevation at Great Salt Lake is about 4,200 feet and at Tre-monton, Utah, on the eastern fringe of this area, at-4,322 feet,- with elevations rising to the north and northwest. *93 Generally, the elevations are substantially below any other sales reported in these findings.
This area was and is primarily used for winter grazing, with some spring, summer and fall grazing in limited areas, and with dry farming having been developed to some extent in the eastern portion in the years subsequent to 1905. These lands were unimproved grazing lands at the time of the sales involved in Mr. Kiepe’s analysis. The cover type was grasses with areas of sagebrush, and with the southwest portion having a salt desert shrub and little grass.
These lands comprised the odd-numbered sections, with the even-numbered sections being public domain, an undefined amount of which had been transferred into private ownership prior to the railroad sales. Mr. Kiepe concluded that very few transfers into private ownership had been made from the public domain because this was not a homestead area and livestock men could not have “wedged” their way into this area. The Central Pacific was not successful in selling all its lands in Box Elder county, and Mr. Palmer since 1948 has been the resident land agent of the successor railroad company to assist in disposing of the residue.
Mr. Palmer discussed the condition of the lands in 1905 with people who had used them at that time. His opinion was that the lands involved in the Central Pacific sales had a carrying capacity in 1905 of 6 acres per animal unit month. Mr. Kiepe accorded these lands a lower carrying capacity than Mr. Palmer, 8 acres per animal unit month. Mr. Kiepe made an allowance because of his conclusion that the purchasers of the railroad lands obtained free grazing upon a large part of the intervening sections. Consequently, he increased the forage available to purchasei’s to 4y2 acres per animal unit month.
101. On the basis of the deeds in evidence, Mr. Kiepe analyzed 48 Central Pacific Eailroad sales in Box Elder County for the period 1895 to 1906. He first divided the sales into groups of sales covering less than one section and covering one section or more each. There were 26 sales of less than one section covering 4,974.37 acres for a total consideration of $14,418.85, or an average of $2.90 per acre, and 22 sales of one section or more covering 373,094.65 acres for a con *94 sideration of $294,512.37 or an average of $0.79 per acre. A large number of the sales of one section or more were made to one purchaser, George Crocker in 1895. In order to make what he considered to be a finer adjustment, Mr. Kiepe analyzed separately the Crocker sales and the sales between 1900 and 1904.
102. Among the 48 sales, there were ten sales by the Central Pacific Railroad Company in Box Elder County between 1900 and 1904, covering 12,087.54 acres for a consideration of $17,235.62 or an average price of $1.43 per acre. Mr. Kiepe made a downward adjustment of 10 percent because of the time payment plan, and a downward adjustment of 40 percent due to his conclusion as to the difference in quality of the lands. The total downward adjustment of 50 percent was applied to the average price of $1.43 per acre, and Mr. Kiepe thereby arrived at an indication of value for the subject lands as of July 14,1905, of $0.72 per acre.
103. The Central Pacific Railroad made a number of sales in Box Elder County to George Crocker from 1895 to 1911. The purchaser was a brother of one of the five owners and developers of the railroad. From conversations with managers of Crocker’s estate, Mr. Kiepe concluded that this relationship did not affect the considerations on the sales.
According to Mr. Kiepe’s analysis, Crocker purchased in these transactions 344,177.71 acres for a total consideration of $273,994.90, or an average of $0.79 per acre, with most of the lands being purchased in 1895. Mr. Kiepe concluded that these Crocker lands approximated the subject lands in carrying capacity at the time of sale, and that the sales were made for cash. He further believed that Crocker grazed lands in this area almost twice the size of his privately acquired lands because the checkerboard pattern of his acquisitions gave him control of the intervening sections. Since most of Crocker’s purchases were made in 1895, Mr. Kiepe made an upward adjustment on the basis of his relative price indices of 18 percent, and a downward adjustment of 27 percent on the basis of his judgment that the use of the intervening sections, together with his acquired lands, would afford Crocker more forage than was available on subject lands. The total net downward adjustment of 9 percent *95 was applied by Mr. Kiepe to the average price of these railroad lands of $0.79 per acre, for an indication of value of $0.72 per acre for subject lands.
104. The following table is a summary of the sales data relied upon by Mr. Kiepe to arrive at value indications for subject lands:

Mr. Kiepe recognized that the range of his value indications was from $0.68 to $0.83 per acre, and that the average of all such indications was $0.74 per acre. It was his final opinion that subject lands had a value of $730,332.75, or $0.75 per acre as of July 14, 1905, after giving consideration to his capitalization approach to value.
105. Mr. Kiepe also made an analysis of the worth of the subject property from the capitalization approach. In doing this, he considered taxes, costs of the supervision of the investment and the rate of return the investor would expect on his investment in the property.
Mr. Kiepe considered that the subject lands were in a frontier area where public improvements such as roads, bridges and schools would be needed, and that it could be expected that taxes would be as high as the population could bear. Mr. Kiepe investigated taxing practices in the State of Utah about 1905 and concluded that a tax rate of about 2 percent of the capitalized value of the property could be expected.
For supervision of the property, such as collecting and disbursing moneys, payments to real estate brokers for finding tenants, costs of advertising and record keeping, etc., Mr. Kiepe estimated an expense at the rate of one-half of 1 percent of the capitalized value of the property.
*96 Mr. Kiepe further considered that a reasonable rate of return on a real estate investment is made up of four factors, which are quite generally accepted in real estate appraising: (1) safe rate, (2) risk rate, (3) liquidity of investment, and (4) freedom from management. From his investigation Mr. Kiepe concluded that mortgage and long-term loans commanded 8 percent interest in 1905, and considered that an investor would expect a larger return if he owned the property and assumed all costs and risk.
His information was that the prevailing rate on safe investments in 1905 was about 4 percent. On the basis that the subject property would involve greater risks than some other types of investments, such risks being drought, short grazing seasons, storms, forest fires, livestock disease, failure of the livestock market and livestock prices, etc., and further that such risks would have to be considered by any owner of the subject lands, Mr. Kiepe concluded that the owner of subject lands would have to bear a risk, for which not less than 2 percent should be added to the capitalization rate.
Liquidity of investment concerns the speed with which the owner could get money if he needed it through disposal of the property. Mr. Kiepe considered that the subj ect property would be difficult to sell, and that a considerable amount of time would be required for an owner to liquidate his investment and recover the fair value of the lands. Mr. Kiepe ascribed 2 percent to the capitalization rate for lack of liquidity in the investment.
It was contemplated by Mr. Kiepe that the actual management of the property (as distinguished from supervision of the property) would require special knowledge, time and expense. For this lack of freedom from management, Mr. Kiepe included 1.5 percent in the capitalization rate.
The total of the items included in the capitalization rate as computed by Mr. Kiepe thus amounted to 12 percent, being comprised of 2 percent for taxes, one-half of one percent for supervision, 4 percent for a safe rate of return, 2 percent for risk, 2 percent for liquidity of investment, and 1.5 percent for management.
After consideration of the leases involving subject lands during the years 1900 to 1905, Mr. Kiepe concluded that the *97 actual rentals received were too low and that he should use the maximum rental of $0.04 per acre that could be expected by a purchaser of subject lands in 1905. He applied this rental rate to the 973,777 acres of subject lands to arrive at an annual rental income of $38,951, which he reduced to the sum of $38,500. Mr. Kiepe recognized an additional source of income from the subject lands to be from timber sales. From his investigation he reported that sales of timber from the subject lands during the period 1905 to 1920 averaged $3,756 per year, which sum Mr. Iviepe added to his figure for annual rental income for a total annual income of $42,256.
Mr. Kiepe consulted several other sources of information to determine whether this total annual income figure of $42,256 was reasonable. He analyzed leases made by the Utah State Board of Land Commissioners shown in the annual reports of that Board. He also examined leasing systems applied to grazing lands owned by the State of Wyoming, the State of Texas and the Northern Pacific Kailroad. The information so obtained was not correlated to the value of the subject lands but was used to confirm the appraisers’ knowledge and conclusions as to the reasonable income which a prospective purchaser could expect from these lands.
Mr. Kiepe concluded that an annual income of $42,256 capitalized at 12 percent indicates a value for subject lands from a capitalization approach of $352,133. Mr. Kiepe did not consider this approach as reliable as the market data or comparable sales approach.
106. The market value of the 973,777 acres of subject lands as of July 14,1905, was $1,217,221.25, or an average of $1.25 per acre.
CONOLTJSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover $879,067.17, with interest thereon as part of just compensation at 5% from July 14,1905 to July 14,1934, and at 4% from the latter date to date of payment, less remaining offsets, if any, as determined in further proceedings pursuant to Buie 38 (c), and judgement is entered to that effect.
*98 In this case and in Nos. 47568, 47570, 47571 and 47572, consolidated therewith, the following order was entered on January 24,1958:
ORDER
These cases come before the court on the joint motion of plaintiffs and defendant for entry of consolidated judgment pursuant to the formal stipulation of the parties filed January 20,1958, signed on behalf of plaintiffs by their attorney of record and on behalf of defendant by Assistant Attorney General Perry W. Morton. By the stipulation, the parties agreed to the entry of a consolidated judgment in the five above-entitled cases in favor of plaintiffs and against defendant in the sum of $3,250,000 in full settlement of all claims of plaintiffs set forth in their petitions in these five cases, as well as all claims arising out of the subject matter of these cases which could have been asserted therein, reserving only those matters expressly stated in said stipulation, and itemizing the offsets and credits which are not to be allowed to the defendant in any other cases or proceedings.
Now, therefore, it is ordered this twenty-fourth day of January, 1958, that a consolidated judgment in the above-entitled cases be and the same is entered in favor of the plaintiffs and against the defendant in the sum of three million two hundred fifty thousand dollars ($3,250,000).
By the Court.
MarviN JoNes,

Chief Judge.

 The Ute Jurisdictional Act of June 28, 1938, c. 776 (62 Stat. 1209), as amended by the Act of July 15, 1941, c. 299 (55 Stat. 593) ; June 22, 1943 (57 Stat. 160) ; June 11, 1946, c. 378 (60 Stat. 255) ; and Sections 1, 2, 11, and 25 of the Act of August 13, 1946, c. 959 (60 Stat. 1049)..

 See Alcea Band of Tillamooks v. United States, 115 C. Cls. 463; Rogue River Tribe of Indians v. United States, 116 C. Cls. 454, cert. den. 341 U. S. 902.

 Records not available.